In the

# United States Court of Appeals

## For the Seventh Circuit

No. 07-2197

JESSICA MAGYAR,

*Plaintiff-Appellant,*

*v.*

SAINT JOSEPH REGIONAL MEDICAL CENTER,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Indiana, South Bend Division.
No. 3:05-CV-0452—**Robert L. Miller, Jr.**, *Chief Judge.*

ARGUED NOVEMBER 7, 2007—DECIDED SEPTEMBER 12, 2008

Before POSNER, WOOD, and WILLIAMS, *Circuit Judges.*

WOOD, *Circuit Judge.* Jessica Magyar (to whom we refer in this opinion using her former last name of Houston) lost her job at Saint Joseph Regional Medical Center ("the Hospital") after she complained about perceived sexual harassment. She sued the Hospital on the theory that it had violated the anti-retaliation provision of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a). Reasoning that the evidence Houston submitted in response to

the Hospital's summary judgment motion could not support a finding of causation, or in the alternative could not show that the Hospital's stated motive for terminating her was pretextual, the district court granted summary judgment to the Hospital. If we were the ultimate trier of fact, we would find this to be a close case. We are not, however, and we conclude that the record viewed in the light most favorable to Houston would permit her to prevail. We therefore reverse and remand for further proceedings.

## I

While attending college, Houston took a position on April 19, 2004, as a part-time assistant scheduler in the Hospital's surgical department. She was classified as a PRN employee, which means that her work hours depended on the needs of the Hospital; she did not need to conform to regular hours, did not receive benefits, and was not required to accept work hours when offered. The equivalent of a full-time surgery scheduler position was covered by three people: one regular part-time employee (Carmen Sanchez) who worked half-time, and two PRN employees (Houston and Mikisha Williams, also a college student) who together took up the other half of the hours.

One day, Dale Carl, a 52-year-old male co-worker, came into a crowded Hospital lounge where there were no free chairs. Plopping down on 22-year-old Houston's lap, he whispered "You're pretty" into her ear. Houston was not amused. This happened some time between her April

hiring date and late July or early August. That was not the first instance of Carl's misbehavior. Houston testified at her deposition that approximately one week before that incident, Carl had also sat on her lap and whispered a comment about her appearance. She explained that "I was hoping it was just a one-time occurrence, and I didn't—I didn't really—that was my first real job and I really didn't know what to do. And I had to check to see, you know, like what are the exact standards in the work force. And then I knew once he did that the second time that I had to talk to her because it was not a one-time occurrence." When Carl repeated the same move, Houston concluded that it was time to take action.

Around the first week of August, Houston reported the second incident to Pam Goddard, her boss. During this meeting, Goddard expressed reluctance to speak to Carl about the incident if Houston was unwilling to file a formal complaint. In response, Houston revealed that she had been a victim of sexual assault in the past and therefore she was sensitive to such behavior. Goddard agreed to speak to Carl and apparently did so later that day. Although the dissent asserts that Carl "apologized profusely," nothing in the record shows that he ever said a word to Houston or that she even heard that he had apologized to Goddard. The reason is because Goddard actually told him not to apologize to Houston when he asked whether he should do so.

The dissent contends that Goddard dealt with the sexual harassment complaint effectively, as no further incidents took place. But that is only half the story; from

Houston's perspective, there was no evidence that any-thing (effective or otherwise) had happened. Goddard took no steps whatsoever to communicate with Houston regarding any resolution of her complaint, and so a trier of fact could infer that Houston (especially given the earlier incident of sexual assault) was left in fear that at any moment there might be a third incident. Goddard does not even allege that she followed up with Houston; her deposition testimony reveals that she simply assumed that the matter had been put to rest: "I talked to Mr. Carl that afternoon regarding Ms. [Houston]'s complaint. I heard nothing more from Ms. [Houston] regarding Mr. Carl and believed the issue had been resolved to Ms. [Houston]'s satisfaction, as I had spoken to Mr. Carl, as Ms. [Houston] requested, and no further incidents had occurred."

Houston had every reason to wonder whether any action had been taken at all; she probably attributed the lack of further incidents to her own attempts to avoid Carl. When asked in her deposition whether Carl did anything that Houston considered harassing in nature after Hous-ton's conversation with Goddard, Houston testified as follows: "No. But I also tried to stay as much away from any contact with him. You know, I tried to avoid any of the conversations that I—you know, I tried to keep anything I had with him short." Although the dissent asserts that Houston sent an email to Goddard after the meeting to express satisfaction with Goddard's handling of the complaint ("the smiley-face email"), this email was sent on July 16, weeks before the meeting in question, and did not pertain to the Carl incident.

Therefore, on September 17, having received no follow-up information from Goddard about the resolution of the incident, Houston complained about Goddard's failure to respond to her complaint to the Hospital's General Counsel and Organizational Integrity Officer, Robert Wade. Sometime during the following week, Wade contacted Human Resources ("HR"), and HR instructed Goddard to meet with Houston again. On September 24, Houston and Goddard met twice; at some point, the discussion turned from the incident with Carl to the question why Houston felt the need to approach Wade. The next day, Goddard emailed Wade to report that Houston's issues "are resolved."

Goddard was mistaken. On September 26 (nine days after her first contact with Wade), Houston sent Wade a formal letter addressed "To Whom It May Concern," complaining about the manner in which Goddard had handled her initial complaint and the new fact that Houston's "job had been posted on the job listings" without notifying her, in apparent "retaliation for me turning her [Goddard] in." Houston's affidavit and her September 26 letter both indicate that she considered it inappropriate that she had to reveal her traumatic past in order to prod Goddard into action. On October 7, Goddard submitted to HR a job requisition form to restructure the position covered by PRN employees Houston and Williams into a single regular half-time position with benefits. The dissent defends Goddard's decision to expend budget funds on the payment of benefits by assuming that, if Goddard did not use these funds, they would disappear in the next budget cycle. There is no support in the record for this factual assumption (which

interprets the record in the light most favorable to the defendant Hospital), nor for assuming that this fact, even if true, motivated Goddard's decision.

In any event, Houston was unable to bid for the new position because it conflicted with her class schedule. On October 20, the Hospital gave the job, which now included benefits, to Williams, who was the only person to bid for it since she had dropped out of college and freed up her schedule. Two days later, Goddard told Houston that she remained classified as a PRN and that she would be called if she was needed.

Goddard's statement turned out to be only half true. Shortly after she told Houston that she was still a PRN, Goddard told Williams and Sanchez to let her know if they needed someone to cover for them, rather than calling Houston. The Hospital asserts that the reason for this instruction was Goddard's business policy of covering shifts with regular employees whenever it is possible to do so without paying overtime, rather than using PRNs. Between October 22, 2004, and April 26, 2005, Houston was not called in to work at the Hospital a single time. On April 26, 2005, she received notice that she had been formally terminated because she did not work enough hours as a PRN employee during the relevant period; on the Termination Form submitted to HR effecting this action, Goddard marked "no" in the box asking whether the employee was eligible for rehire.

Believing that the Hospital had retaliated against her for complaining about Carl's harassment and for complaining about its failure adequately to address that harassment, Houston filed this suit under Title VII. The

district court granted summary judgment to the Hospital, finding that Houston had failed to establish a *prima facie* case of retaliation, and that she failed to show that the Hospital's assertion that it was planning to restructure her job was pretextual.

## II

Before turning to Houston's arguments on appeal, we should address a procedural point that the Hospital has raised in support of its judgment. In the district court, the Hospital moved to strike Houston's affidavit because it was unsigned, bearing instead solely an "electronic signature." The district court denied the motion because Houston submitted another affidavit on which her actual signature was added near the electronic signature. On appeal, the Hospital asks this court to disregard Houston's affidavit and thus to evaluate Houston's response to its summary judgment without that information.

A district court's ruling on a motion to strike an affidavit is reviewed for an abuse of discretion. *Mannoia v. Farrow*, 476 F.3d 453, 456 (7th Cir. 2007). The Hospital was not prejudiced by the initial defect in the affidavit (to the extent that it was a defect at all in a world where electronic signatures are regularly honored, see, *e.g.*, Electronic Signatures in Global and National Commerce Act, 15 U.S.C. § 7001 (requiring recognition of electronic signatures), Uniform Electronic Transactions Act, and Indiana Electronic Digital Signature Act, Burns Ind. Code Ann. § 5-24-3-1). In any event, Houston immediately substituted a copy with a traditional signature. The

district court did not abuse its discretion in denying Hospital's motion to strike. Houston's affidavit is thus properly part of the record before us.

## III

The only issue remaining in this appeal is whether the district court erred in granting summary judgment for the Hospital. We review a grant of summary judgment *de novo*. *Sound of Music Co. v. 3M*, 477 F.3d 910, 914 (7th Cir. 2007).

A claim of retaliation under Title VII may be established under either the direct method or the indirect burden-shifting method, which is an adaptation of the familiar framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). See *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002). Houston has decided to rely on the direct method of proof. To establish a *prima facie* case this way, she must "present direct evidence of a statutorily protected activity, an adverse employment action, and a causal connection between the two." *Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 531 (7th Cir. 2003). We consider each element in turn.

### A. Statutorily protected activity

The Hospital argues that Houston was not engaging in statutorily protected activity because, even by Houston's allegations, the retaliation was a response to her approaching Wade to complain about Goddard's complaint-management skills ("in retaliation for me

turning her in"), not her earlier approach to Goddard to complain about Carl's alleged sexual harassment.

The district court implicitly rejected this argument, stating that "[e]ven though the Hospital is correct that Ms. Houston's complaint to Mr. Wade about Ms. Goddard can't be seen as a complaint about sexual harassment or discrimination, Ms. Houston's complaint about inappropriate touching by Mr. Carl clearly falls within Title VII protection." In support of her position, Houston cites the district court's decision in *Johnson v. County of Nassau*, 480 F. Supp. 2d 581, 602 (E.D.N.Y. 2007). The court there found that the plaintiff, who was Director of the Office of Diversity, had stepped outside his job duties and therefore engaged in protected activity, because in addition to raising employee complaints of discrimination "he complained that Defendants were not fulfilling their duties under Title VII in properly investigating these complaints." While that case is obviously not binding on this court and the facts are somewhat different, we find it persuasive. Taking the facts in the light most favorable to Houston, as we must at this stage, the complaint to Goddard with the follow-up complaint to Wade made up one continuous complaint process to which Houston resorted. In effect, she was asking Wade to ensure that the institution do something about sexual harassment; there is not a hint that she had another, unrelated, grievance about Goddard.[1]

---

[1] We note in this connection that the procedures for addressing sexual harassment play a critical role in this area of the law.

(continued...)

We note that, to succeed on a retaliation claim, Houston need not prove that the underlying conduct she perceived as sexual harassment actually was serious enough to constitute a Title VII violation. Instead, she need only show that, when instituting her grievance, she had a "sincere and reasonable belief" that she was opposing an unlawful practice. *Hamner v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 224 F.3d 701, 706-07 (7th Cir. 2000). The objective reasonableness of the belief is not assessed by examining whether the conduct was persistent or severe enough to be unlawful, but merely whether it falls into the category of conduct prohibited by the statute. Contrast *id.* (holding that grievance about harassment engendered by "homophobia" was not objectively reasonable and thus could not form the basis of a retaliation claim, because "[s]exual orientation is not a classification that is protected under Title VII"). Title VII does protect employees from discrimination on the basis of sex, and

---

[1] (...continued)

Indeed, in *Faragher v. City of Boca Raton,* 524 U.S. 775 (1998), and *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742 (1998), the Supreme Court recognized a procedural affirmative defense for employers, when harassment by a supervisor does not result in a tangible employment action. If the employer has exercised reasonable care to prevent and correct harassment (typically through an effective anti-harassment policy for the workplace) and the employee has unreasonably failed to avail herself of that policy, then the employer will prevail. See *Faragher,* 524 U.S. at 807-08; *Ellerth,* 524 U.S. at 764-65. An employee in the midst of complaining about underlying harassment may well wish to criticize the company's procedures at the same time.

sexual harassment is a recognized species of such discrimination. 29 C.F.R. § 1604.11.

In this case, the record sufficiently demonstrates that Houston subjectively felt that she had been sexually harassed. In addition, the lap incidents involved actual touching. This court has often recognized in the past that unwanted physical contact falls on the more severe side for purposes of sexual harassment. As we noted in *Patton v. Keystone RV Co.,* 455 F.3d 812 (7th Cir. 2006):

> Our precedent provides some guidance on how to evaluate the severity of harassment:
>
>> On one side lie sexual assaults; other physical contact, whether amorous or hostile, for which there is no consent express or implied; uninvited sexual solicitations; intimidating words or acts; obscene language or gestures; pornographic pictures. On the other side lies the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers . . . .

455 F.3d at 816, citing *Baskerville v. Culligan Int'l Co.,* 50 F.3d 428, 430 (7th Cir. 1995). See also, *e.g., Worth v. Tyer,* 276 F.3d 249, 268 (7th Cir. 2001) ("The fact that conduct that involves touching as opposed to verbal behavior increases the severity of the situation."); *Hostetler v. Quality Dining, Inc.,* 218 F.3d 798, 806 (7th Cir. 2000). Having a man old enough to be her father plop into her lap and put his lips to her ear to whisper "you're beautiful" is the type of occurrence that, if it happened often enough, could constitute sexual harassment, and so Houston's grievance was objectively reasonable.

Viewing the evidence in the light most favorable to Houston, we conclude that she has shown that she engaged in a statutorily protected activity when she complained up the chain of command.

### B.  Adverse employment action

The parties do not dispute that Houston suffered an adverse employment action. Whether we look to her initial loss of work around October 20, 2004, when her PRN position disappeared and Williams received the new part-time job, or we focus on her eventual out-and-out termination on April 26 (with the added insult stipulating that she was not eligible for rehire), her case easily satisfies this element.

### C.  Causal connection

The last element Houston must establish is a causal connection between her statutorily protected activity and the adverse employment action. Suspicious timing, together with other facts, can sometimes raise an inference of a causal connection. *Lalvani v. Cook County*, 269 F.3d 785, 790 (7th Cir. 2001); *Paluck v. Gooding Rubber Co.*, 221 F.3d 1003, 1009-10 (7th Cir. 2000). Houston and the Hospital argue over whether the window of time in this case was narrow enough to be suspicious. We can measure the time in several ways. The way most favorable to the Hospital would be from Houston's early August complaint to Goddard to her termination letter almost ten months later. The way most favorable to Houston would

be from her renewed complaint to Wade on September 26 (when Goddard realized that Houston was not going to let the subject drop) to the day when Goddard submitted the restructuring request to HR, on October 7—a mere nine days. Or one might look at Houston's first complaint to Wade on September 17 as the starting-point and her dismissal from her existing PRN job on October 20, approximately a month later, as the end-point. This court has found a month short enough to reinforce an inference of retaliation. See *Lang v. Ill. Dep't of Children & Family Servs.*, 361 F.3d 416, 419 (7th Cir. 2004) (adverse employment actions began "the same month" plaintiff filed the racial discrimination grievance with his union).

Although the lap incidents took place in early August (and perhaps a bit earlier), we think that the approach most favorable to Houston is to assume that the suspicious-timing clock was restarted on September 17, because that is when Houston complained to Wade, the General Counsel and Integrity Officer. From that point, it is at most nine days before the first sign of an adverse employment action, because by the September 26 letter Houston already knew that her job had been posted on the job listings. The fact that full execution of the adverse action took a while longer for bureaucratic reasons is immaterial. Once the wheels were in motion, Goddard submitted the requisition form on October 7, filled the position on October 20, denied Houston work hours, waited several months, and then terminated her in April for working insufficient hours (a flaw that Goddard was able to engineer herself).

The Hospital attempts to minimize the causal link between Houston's complaint to Wade and Goddard's allegedly retaliatory restructuring of the job by pointing out that Goddard "explicitly stated (in a secretly-tape-recorded conversation) that she had no problem with 'anyone taking anything to the Legal Department.'" First of all, no trier of fact would be compelled to believe Goddard's protestation of open-mindedness. Second, while Goddard did literally utter these words, they are sandwiched between other words; taken as a whole, a rational jury could interpret the conversation in Houston's favor. Here is the full quotation:

> I have no problem with anyone taking anything to the legal department but I am just curious when the situation was dealt with I thought it was dealt with very effectively it was a positive out come. You got what you asked for. And yet you still because you don't think I said the right words or I phrased the right sentence what was your expectation of what you wanted to see happen after taking it to the hospital (?) department.

(Hospital Supp. App. 36) (imperfections in transcript of the tape-recorded conversation). A reasonable jury could find Goddard's statements defensive and accusatory. She comes across as having a substantial problem with Houston's decision to take the matter to the legal department, despite her perfunctory statement to the contrary. This, together with testimony from Houston that Goddard's tone with her was defensive and irritated, Goddard's own admission that she felt "shocked" and "bewildered" when she

learned that Houston had complained about Goddard's handling of the complaint, and the fact that Goddard posted Houston's job on the job listings within a few days of this meeting, is more than mere suspicious timing. It is sufficient to raise an inference of causation.

### D. But-for Causation

Even if all that is true, the Hospital argues, it is still entitled to summary judgment on the basis of what it calls unrebutted evidence that Goddard already intended to eliminate Houston's job for a legitimate business reason. Compare *Stone*, 281 F.3d at 644 (holding that summary judgment in favor of defendant is required when defendant presents "unrebutted evidence that he would have taken the adverse employment action against the plaintiff even if he had had no retaliatory motive").

Through Goddard's deposition, the Hospital presented evidence that, upon taking the job of Director of Surgical Services in June 2004, Goddard learned that two PRNs (Houston and Williams) were doing the job of one regular part-time employee. Goddard testified that she regarded this as an undesirable business practice, because the budget allowed for a part-time position with benefits, so it should be filled in that way. (The point about benefits was an odd one, given the fact that benefits impose substantial costs on employers. An August 2005 study performed for the Small Business Administration reported that about 29% of a business's total compensation costs for hourly employees is attributable to benefits. See "Cost of Employee Benefits in Small and Large Businesses," at 6,

at www.sba.gov/advo/research/rs262tot.pdf (last visited 7/19/08). It is unclear why Goddard thought that it would be better if her employer shouldered that burden.) Also, she said, a regular employee would have predictable and reliable hours commitments (though there is no evidence that Houston and Williams were ever unavailable when the Hospital needed them.)

It is true that Houston responded only by commenting that Goddard's statements were self-serving, but this was just another way of saying that a trier of fact would have to evaluate everything Goddard said and decide what to accept and what to reject. Even without direct rebutting evidence from Houston, the Hospital's evidence fails to establish that Houston first would have lost her PRN position and then would have been effectively blacklisted for all similar work until her termination in the absence of the retaliatory motive. It merely shows that the job restructuring might have occurred anyway at some point. On the other hand, a trier of fact might have seen Goddard's explanation of the timing of her action as only a *post hoc* justification. Goddard stated:

> I felt the situation I inherited (two PRN employees filling a regular, part-time position) would need to be addressed . . . . After dealing with the most critical issues facing the Surgical Service Department through the summer of 2004, I turned my attention to correcting the use of PRN employees in a regular position in the fall of 2004.

The Hospital cannot meet its burden on summary judgment by having the actor say only that she was thinking

vaguely of restructuring the job and planned to do it when she got around to it. The fact that the Hospital also presented testimony that Goddard had not had a situation in which two PRNs were sharing a job in all her prior management years at the hospital does not compel a different result. To the contrary, the fact-finder could conclude that the fact that the "situation" continued without being "addressed" for over three months indicates that there was no urgency or even inevitability about the Hospital's decision to terminate Houston's position. Although the dissent contends there is "no doubt" that Goddard intended to convert the PRN positions from the time she came on board despite the delay in carrying out this intention, it is able to come to that conclusion only by viewing the evidence in the record in the light most favorable to the Hospital. That is not the standard we must apply; in our view there is enough in the record to entitle a reasonable jury to find in favor of Houston.

\* \* \*

Because Houston has established a *prima facie* case of retaliation and the Hospital has not shown an absence of material fact on the question whether it would have taken the same action even without a retaliatory motive, we REVERSE the district court's grant of summary judgment in favor of the Hospital and REMAND the case for further proceedings.

POSNER, *Circuit Judge*, dissenting.  The plaintiff, Jessica Houston, contends that the defendant, a hospital that formerly employed her, dismissed her from her quarter-time job in retaliation for her having complained to the hospital's general counsel about the handling of her claim of sexual harassment. There is insufficient evidence of retaliation to allow the case to go to a jury; and even if there were sufficient evidence, there is no evidence of retaliation for engaging in protected conduct, and without that, there is no violation of Title VII. The district judge was therefore right to grant summary judgment for the defendant, and we should affirm.

Shortly after Houston was hired as an assistant scheduler in the hospital's surgery department, where she and another college student shared a half-time position, Pam Goddard became the senior director of surgical services. She had worked for the hospital for many years and as senior services director supervised more than 200 employees. The job of assistant scheduler is a responsible one. It includes providing scrubs to physicians, entering information concerning times for surgery that are given to the scheduler by a nurse, and ordering and picking up x-rays for use in forthcoming surgical operations. College kids who like Houston were working only one-quarter of a normal work week did not work regular hours and there was no assurance that either she or the other assistant scheduler would be available at all times when they were needed. Goddard wanted to replace the two college students with a regular half-time employee, and eventually she did.

But meanwhile there had been an incident at work in which a male employee had sat down in Houston's lap uninvited and said "You're beautiful," and another incident in which he had "whispered [to her] an unwelcome sexual comment," though she has not said what the comment was. After the second incident Houston complained to Goddard. The latter was reluctant to take action because Houston had not invoked the hospital's prescribed procedure for complaining about sexual harassment—until Houston volunteered the information that she had been the victim of a sexual assault, though not by the same man or at the hospital. The same afternoon that Goddard learned this, she spoke to the male employee about whom Houston had complained. He was contrite, and there was no repetition of his offensive behavior. So, in a matter of a few hours, Houston's grievance was successfully resolved.

Houston made no further complaints either about the male employee who she claimed had harassed her or about anyone else, and this is compelling evidence that Goddard's action in response to her complaint had been effective. The statement in the majority opinion that Houston "probably attributed the lack of further incidents to her own attempts to avoid" the alleged harasser is a conjecture that has no basis in the record; she did testify that she tried to minimize her contacts with him, but that is the natural reaction to someone who you think has harassed you, whether or not you fear further harassment. There is also no basis for the assertion in the majority opinion that by not reporting the conversation with the alleged harasser, Goddard had left

Houston "in fear that at any moment there might be a third incident." No reasonable jury could draw such an inference. Houston had made no complaint about the first incident, after the second incident had said that she was in "no rush" to meet with Goddard, filed no complaint against the harasser, made no effort to follow up with Goddard, and waited two months before taking the matter to the general counsel. Those are not the actions of someone in fear of a third incident of harassment "at any moment." When she did eventually complain to the general counsel, she said nothing about fearing a third act of harassment. His notes of their meeting, reporting what she told him, state that "actions have stopped." The harassment was a closed book. Houston's complaint to the general counsel was about Goddard's handling of her complaint. She told him she should not have had to share with Goddard personal information in order to get action on her complaint of harassment. (Of course, she didn't "have" to share anything; all she had to do was to follow the procedures specified by the hospital, and not claimed to be inadequate, for complaining about harassment.)

At a meeting with Goddard shortly after complaining to the general counsel, Houston secretly recorded a conversation in which Goddard said: "I have no problem with anyone taking anything to the legal department but I am just curious when the situation was dealt with I thought it was dealt with very effectively it was a positive outcome. You got what you asked for . . . . I am sorry that you feel the way you feel that as difficult . . . . I felt like it was handled well but obviously you didn't

and you are entitled to your opinion." Houston replied: "I said that at the end you handled it correctly after I told you all the stuff and I stand o[n] that." Notice of the restructured job—a half-time job in place of the two quarter-time jobs one of which Houston had filled—was posted a few days later. Houston could not apply for the job because a half-time job would not leave her enough time for her college classes.

It strains credulity that Goddard would have con- verted two jobs for college kids into one regular job (with benefits) merely to get rid of Houston because of the latter's criticism of Goddard's handling of her complaint of harassment. (Even that, as we shall see, wouldn't be enough to create a prima facie case. Houston was not complaining that Goddard had failed to deal effectively with sexual harassment. There was no harassment after she first contacted Goddard, and she acknowledges that "at the end you handled it correctly." That "end" came within hours of Houston's first complaining about harass- ment.) It is true that the restructuring of the job came hard on the heels of the meeting (the one Houston secretly recorded) at which Goddard expressed irritation (who wouldn't?) at Houston's having complained to the general counsel. But there is no evidence to contradict Goddard's claim that she intended the restructuring from the start and that the delay in implementation was due to her having more pressing matters to attend to in her new job.

The majority expresses puzzlement that Goddard would prefer having one part-time employee with benefits to

two part-time employees without benefits, since benefits are an expense. But her departmental budget allowed for a part-time position with benefits, and it made sense for her to use the funds allotted for that position before they disappeared in the next budget cycle. The majority's conjecture is based on a government report concerning *average* employee benefits, a report that makes no reference to the benefits expense of the St. Joseph Regional Medical Center—obviously not all employers pay the same benefits. Moreover, a part-time employee who receives benefits is bound to be more dependable than one who does not, because part-time jobs with benefits are tough to come by. "Part-time workers are much less likely to have employment-based health insurance than full-timers . . . . In 2004, 18.6 percent of part-time workers were covered by employment-based health benefits through their own employer, compared with 61.5 percent of full-time workers." Employee Benefit Research Institute, "EBRI News: Growing Trend of Part-Time Workers Feeds Into Overall Decline of U.S. Health Coverage," May 2, 2006, www.ebri.org/pdf/ PR_735_2May06.pdf (visited Aug. 22, 2008); to same effect, see Peter S. Fisher, Elaine Ditsler, Colin Gordon and David West, "Nonstandard Jobs, Substandard Benefits," July 2005, pp. 15-22, http://cfcw.org/Nonstandard.pdf (visited Aug. 22, 2008). And it is preferable from an employer's standpoint to have one person doing a job rather than two splitting it, which complicates supervision and increases paperwork (two separate personnel files, etc.).

Houston points out that after the hiring of a regular employee to do her job she was still available for part-time

work, since the regular employee was sometimes swamped, but that Goddard gave her no work. But Goddard testified without contradiction that her practice was to offer part-time work to other regular employees first—which would certainly be the normal practice—and that there was nothing left over for the college kids. (The majority opinion oddly describes this as "blacklist[ing]" Houston.)

Houston argues that the fact that Goddard considered her rude and disrespectful (notably in secretly recording their conversation in violation of Illinois law, 720 ILCS 5/14-2(a)(1)) is evidence of retaliation. No; it is evidence that Goddard considered Houston rude and disrespectful—and an infringer of Goddard's legally protected privacy rights and ungrateful to boot, for Goddard could have insisted that Houston follow the hospital's prescribed procedure for complaining about sexual harassment, but instead she cut the red tape and confronted the alleged harasser without requiring Houston to file a complaint. It is not a violation of Title VII to refuse to employ a person whom you consider (whether or not reasonably) rude and disrespectful, but in any event there is no evidence that that was the motive for the restructuring.

The majority thinks it suspicious that Goddard felt "shocked" and "bewildered" when she learned that Houston had complained about her to her employer's lawyer. That is the natural human reaction to a groundless complaint to your superior. The majority's reasoning places employees such as Pam Goddard in an impossible position: If the employee reacts indignantly to being

complained about, this is taken as evidence of retaliation; but if she reacts by admitting that the complaint about her to her superior is justified, or by not protesting seems tacitly to admit that, she sets herself and her company up for a lawsuit (with the admission as evidence) for failing to handle a claim of sexual harassment in accordance with Title VII.

The majority bolsters its argument that Goddard was conducting a vendetta against Houston by saying that after filling the restructured job Goddard "denied [Houston] work hours, waited several months, and then terminated her in April for working insufficient hours (a flaw that Goddard was able to engineer herself)." But if Goddard wanted to punish Houston, all she had to do was not give her an assignment. No work, no pay. What additional benefit did Goddard obtain by formally terminating her? Why not have let her twist in the wind, always hoping she might receive an assignment?

I conclude that no reasonable jury could find a retaliatory motive in Goddard's actions. But if I am wrong and it could, it could not take the next step and find that the retaliation was for statutorily protected activity, that is, for "oppos[ing] any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e-3(a). Houston's only concern in complaining to the general counsel and repeating the complaint to Goddard was with Goddard's not having acted until Houston told her of having been the victim of a sexual assault prior to her employment by the hospital. Houston was complaining to the general counsel not of having been sexually harassed

(she mentioned the alleged harassment only by way of background, for that grievance had long since been resolved), but of Goddard's handling of the grievance. In the conversation with Goddard that she secretly recorded in violation of Illinois law, Houston confirmed that she had complained to the general counsel only because she didn't like having had to share "all the stuff." (In fact she hadn't had to, as I noted earlier.) Yet she took the initiative in sharing the information with the general counsel and now, in this lawsuit, with the world.

The majority's statement that "in effect, [Houston] was asking [the general counsel] to ensure that the institution do something about sexual harassment" is an unwarranted gloss on Houston's own version of her complaint ("in effect" is the giveaway). Houston was not concerned about sexual harassment. The alleged harassment was history, and there is nothing to suggest that she was concerned about actual or potential harassment of other employees. The statement in a footnote of the majority opinion that "an employee in the midst of complaining about underlying harassment may well wish to criticize the company's procedures at the same time" thus contains two errors: Houston was not complaining about being harassed—that complaint had been resolved long ago—and she was not complaining about the company's procedures either. I cannot find any hint that she was dissatisfied with those procedures. She does argue that Goddard violated them. The hospital's antiharassment policy (the only possible "procedures" to which the majority opinion can be referring) states that "If you believe you or any other employee is being subjected to

conduct or comments that violate this policy, you are encouraged and have a responsibility to immediately report these matters to the Human Resources Department. If for any reason you do not feel comfortable reporting your concerns to Human resources, you may report your concerns to the Integrity Officer." *Houston* believed that she had been harassed, and she therefore had a responsibility to report the matter not to Goddard, but to either the Human Resources Department or the Integrity Officer. She did not fulfill that responsibility. *Goddard*, who did not witness the incident that Houston alleged to be harassment, did not, when Houston first spoke to her, believe that Houston had been harassed. Not that she disbelieved it; she just didn't have evidence beyond Houston's say-so. So the policy did not require her to report the matter to the Human Resources Department or the Integrity Officer.

Notice also that Goddard could have complied with the antiharassment policy fully just by reporting Houston's concern to the Human Resources Department. That would have delayed remediation. Goddard went out of her way, by directly confronting the alleged harasser, to make sure that the problem was resolved immediately.

The statement in the majority opinion that Houston "subjectively felt that she had been sexually harassed," while true, is irrelevant. She was not (I repeat) complaining about the harasser. She was complaining about Goddard, who had not harassed her. If when Houston met with the general counsel she was still concerned about being sexually harassed, why didn't she tell him? Nor had

Goddard failed to handle Houston's complaint of sexual harassment properly. She had, as Houston concedes, acted correctly in the end. And in the beginning too; her initial reluctance to take action had been reasonable. We warned in *McDonnell v. Cisneros*, 84 F.3d 256, 260-61 (7th Cir. 1996), against placing supervisors on a razor's edge, where if they fail to act precipitately on a complaint of sexual harassment they are sued for violating Title VII, while if they act precipitately they are sued by the alleged harasser. "Alleged harassers . . . have brought a number of state common law claims, including wrongful discharge, breach of contract, tortious interference with an employment contract, invasion of privacy, negligent investigation, intentional interference with an employment relationship, defamation, libel, and intentional infliction of emotional distress." 1 Alba Conte, *Sexual Harassment in the Workplace: Law and Practice* 703-05 (3d ed. 2000); see also Barbara Lindemann & David D. Kadue, *Sexual Harassment in Employment Law* 359-60 (1992).

At first Goddard wasn't sure that the incident about which Houston was complaining had been sexually motivated, because Houston's email requesting the meeting to discuss it had said that it was "not a rush" (that is, that there was no urgency about Goddard's meeting with her) and because Houston was unwilling to use the hospital's prescribed procedure for reporting sexual harassment. Shortly after the meeting with Goddard of which Houston now complains (the meeting in which she revealed the sexual assault), she emailed Goddard saying: "Thank you . . . so much for listening and understanding. You made me feel a lot more comfortable when I left.

Thanks ☺." The statement in the majority opinion that the meeting to which the email referred was not about the alleged sexual harassment is unpersuasive in light of Houston's failure to offer an alternative explanation of what the meeting was about.

Houston is not complaining that Goddard interrogated her about her sexual history in a way that might discourage complaints about sexual harassment. There was no interrogation. The information about a previous sexual assault was volunteered by Houston in order to prod Goddard into what could have turned out to be a precipitate reaction to the complaint. As the majority puts it "In response [to Goddard's reluctance to speak to the alleged harasser unless Houston filed a formal complaint], Houston revealed that she had been a victim of sexual assault."

Goddard's reluctance to act, until Houston volunteered the information suggestive of Houston's special sensitivity to sexual harassment, was not only reasonable but also harmless, because no harassment occurred in the brief interval (a matter of hours) between Houston's complaining about the harassment and Goddard's taking action, conceded by Houston to have been effective—in fact it was, as I noted, beyond the call of duty.

The only possible explanation for Houston's dramatic swerve from being pleased with Goddard's handling of the situation (the smiley-face email) to litigation planning, complete with an illegal secret tape recording, is that she saw that she was about to lose her job. Otherwise the two-month interval between the meeting with

Goddard that is the core of her complaint about Goddard's handling of the harassment grievance and the meeting with the general counsel makes no sense (and she requested and met with the general counsel on the same day, so the delay was her doing, not his). Nothing had happened in between. We know she knew about the job restructuring by September 26, and she may well have gotten wind of it earlier—before the meeting with the general counsel, which took place on September 17.

She claims not to have known that Goddard had spoken with the accused harasser about the incident. But Goddard had told Houston she would do so, and why wouldn't Houston either assume she had or, if uncertain, check with her? It's not as if the harassment had continued, which would have suggested that Goddard had not followed through. On the contrary, the fact that the harassment ceased should have made Houston realize that Goddard had done as promised—as she had.

To say as the majority opinion does that Houston "engaged in a statutorily protected activity when she complained up the chain of command" is to equivocate. Her complaint to Goddard about sexual harassment was protected; her complaint to the general counsel about Goddard, and its repetition to Goddard in the recorded conversation, were not. That is why, even if Goddard did restructure the job just in order to get rid of Houston for having criticized her, her action, while it would not have been nice, could not have violated Title VII.

Against this the majority opinion just cites a district court decision and remarks that it must "tak[e] the facts in

the light most favorable to Houston." The district court case is inapposite (and anyway is not authority) because the plaintiff's complaint in that case concerned the violation of duties imposed by Title VII, and there was no violation of any such duty in this case. Houston complained about harassment; the hospital responded; the harassment ceased. The evidence that she was not complaining to the general counsel about protected activity consists of her own admissions.

Suppose she had complained to Goddard about the first incident of unwanted attention from the male coworker, Goddard had done nothing, and then the second incident had occurred. Whether or not Goddard had acted reasonably in failing to prevent that second incident, Houston could not be fired for complaining about Goddard's failure; for that failure would raise a question about the adequacy of the hospital's practices or procedures for preventing sexual harassment, and so she would not have lacked a "reasonable belief" (whether or not correct) that the hospital had violated Title VII. Her complaint would be statutorily protected, e.g., *Holland v. Jefferson National Life Ins. Co.*, 883 F.2d 1307, 1315 (7th Cir. 1989), because she would be complaining about inaction, not about insensitivity.

All that the hospital "was required to do in order to satisfy its obligations under Title VII was to take prompt action reasonably calculated to end the harassment and reasonably likely to prevent the conduct from recurring. The steps taken by [Goddard] clearly satisfied this standard." *Berry v. Delta Airlines*, 260 F.3d 803, 813 (7th Cir.

2001); see also *Cerros v. Steel Technologies, Inc.*, 398 F.3d 944, 954 (7th Cir. 2005) ("the efficacy of an employer's remedial action is material to our determination whether the action was 'reasonably likely to prevent the harassment from recurring' "); *Williams v. Waste Management of Illinois*, 361 F.3d 1021, 1029-30 (7th Cir. 2004) ("the net result [of a mere verbal warning] was that Williams's complaint was dealt with within twenty-four hours, and he experienced no further race-based harassment"); *Andreoli v. Gates*, 482 F.3d 641, 644 n. 2 (3d Cir. 2007) ("a remedial action that stops the harassment is adequate as a matter of law"); *Swenson v. Potter*, 271 F.3d 1184, 1196-98 (9th Cir. 2001); *Spicer v. Virginia*, 66 F.3d 705, 710-11 (4th Cir. 1995). No reasonable person would have thought that Goddard had violated Title VII by her handling of Houston's complaint; the majority's contrary conclusion is inconsistent with the case law.

My colleagues are deceived. This is not a case about the sexual harassment of an employee, but about the litigation harassment of an employer. The district judge was right to end it.