In the

# United States Court of Appeals

## For the Seventh Circuit

No. 19-2082

CALVIN HORNE,

*Plaintiff-Appellant,*

*v.*

ELECTRIC EEL MANUFACTURING
COMPANY, INC., *et al.,*

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:17-cv-08080 — **Ronald A. Guzmán**, *Judge.*

ARGUED JANUARY 23, 2020 — DECIDED FEBRUARY 10, 2021

Before ROVNER, HAMILTON, and SCUDDER, *Circuit Judges.*

ROVNER, *Circuit Judge.* Calvin Horne was injured while
using a drain rodding machine made by Electric Eel Manufac-
turing Company, Inc. ("Electric Eel"), and rented to him by
Home Depot USA, Inc. ("Home Depot"). He brought claims
against the defendants for negligence, breach of warranty, and

strict product liability, among other things. The district court granted summary judgment in favor of the defendants. We affirm in part, and vacate and remand in part.

**I.**

In reviewing this grant of a motion for summary judgment, we examine the record in the light most favorable to the nonmovant, Horne, and construe all reasonable inferences from the evidence in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Yahnke v. Kane County, Ill.*, 823 F.3d 1066, 1070 (7th Cir. 2016). The review of the record was complicated in the district court when the parties failed to fully comply with Local Rule 56.1.[1] In his response to the defendants' Local Rule 56.1(a)(3) statement of material facts, Horne failed to support his denials of certain of the defendants' facts with specific references to the record. The district court therefore deemed Horne "to have admitted all properly supported material facts

---

[1] That Rule requires the movant to furnish "a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law." Each fact must be supported by "specific references to the affidavits, parts of the record, and other supporting materials relied upon." In turn, the party opposing summary judgment must include "a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon[.]" In addition, the nonmovant may file "a statement … of any additional facts that require the denial of summary judgment, including references to the affidavits, parts of the record, and other supporting materials relied upon." The Rule warns, "All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party." Local Rule 56.1(b)(3)(C).

in the defendants' statement." *Horne v. Home Depot USA, Inc.*, 2019 WL 556709, *1 n.1 (N.D. Ill. Feb. 12, 2019) (hereafter "*Horne I*").[2] The court "also disregarded several immaterial facts contained in the parties' Local Rule 56.1 statements, as well as statements and/or responses that are not supported by the evidence cited." *Id*. As is apparent from the district court's recitation of the material facts, the court did credit certain statements that Horne properly supported in his own statement of material facts. R. 172. None of the parties contested the court's decision to deem certain facts admitted and to disregard other asserted facts as immaterial or unsupported. We have therefore largely adopted the district court's version of the facts for summary judgment purposes.

On July 21, 2017, Horne noticed that the main sewer drain for his house was clogged. He decided to rent an electric drain rodder from Home Depot so that he could attempt to clear the drain. Horne went to the tool rental department at the Home Depot in Homewood, Illinois, and told an employee that he needed an electric rodder. The employee selected a machine and presented it to Horne, who then signed a three-page rental contract. The entire rental process lasted approximately ten minutes.

The contract identified the rented device as "Drain Cleaner 100' x 3/4"," with Part Number 0448505995. The equipment corresponding to that part number was an Electric Eel

---

[2] In their appellate brief, the defendants claim that "the court deemed all of defendants' statements of material fact admitted." Brief of Defendants-Appellees, at 12. That is an overstatement; the court limited the admissions to the defendants' "properly supported" statements of fact.

Model R, which had been shipped to the Homewood store on May 2, 2017. That particular machine had been assembled manually by Electric Eel employee Richard Berry. Berry tested the machine before it was shipped to the Homewood Home Depot, ensuring that the foot pedal that acted as an on/off switch was working properly, and that the forward/reverse toggle switch also worked. When the machine is working properly, the operator presses down on the foot pedal to start the motor on the drain rodder, causing the cable (and the cage in which the one hundred foot cable is coiled) to rotate. When the pedal is released, the motor stops. On May 7, 2017, one day after a customer returned the machine and just five days after the device had been delivered to the store, a Home Depot employee determined that the foot pedal was defective. The pedal was "leaking air" and the Home Depot employee repaired the machine by replacing the foot pedal on May 10.

Prior to the event at issue here, Horne had rented electric drain rodders from Home Depot a handful of times over a period of many years to clear the same drain at his home. The rodder he rented on July 21, 2017, appeared different from those he rented in the past. This machine was "raggedy" and "kind of old." It had peeling paint, was rusty, and had a "dingy yellow" plastic cover over the machine's cage and cable. Horne did not complain about the condition of the machine at the time of the rental because the Home Depot employee had selected it and it seemed fine to use.

Horne took the machine home and read the operating manual that Home Depot provided. Two friends, Perry Bennett and Reginald Tolliver, were with Horne as he set up the rodder and began to use it. After positioning the rodder near an

outdoor access port to the drain, Horne manually lowered the device's cable until it reached the bottom of the access pipe, approximately three to four feet underground. At that depth, this vertical section of pipe connected to a horizontal pipe that extended in two directions, toward the house and toward the street. With the forward/reverse toggle switch in the forward position, Horne pressed down on the foot pedal in order to cause the cable to rotate and extend into the section of horizontal pipe leading toward the street. After the cable made the turn, Horne lifted his foot from the pedal so that he could manually extend the cable into the drain until it reached an obstruction. He then put his foot back on the pedal in order to advance the cable through the obstruction. The cable was extended approximately seven to nine feet into the drain at that point. As the cage and cable rotated, Bennett saw a bend or kink in the cable as it emerged from the cage of the machine. He alerted Horne, who then also saw the kink in the part of the cable that was unspooling from the cage of the machine. He took his foot off the pedal and removed his hands from the cable.

The kinked part of the cable had not yet reached the drain when Horne stopped the device. Bennett advised him to not put the bent cable down the pipe, fearing it could crack the pipe. In order to remove the cable from the drain, Horne placed the toggle switch into the reverse position and then pressed down on the foot pedal. But the powered reverse did not work, and nothing happened when Horne pressed down on the pedal. Horne then decided to remove the cable by hand so that he could return the malfunctioning machine to Home Depot and exchange it for another. As Tolliver watched, Horne

tugged the cable with both hands, applying an amount of force that he described as "barely none." The cable immediately wrapped around his right forearm and hand, and he was flipped over and thrown to the ground. The machine also flipped over. Tolliver confirmed Horne's account of the cable wrapping around Horne's arm and flipping both Horne and the machine to the ground. A distracted Bennett did not see how Horne was thrown to the ground but saw Horne on the ground seconds after advising him of the kink in the cable. Horne's right hand was badly injured by the cable and, after the wound became gangrenous, most of his right index finger had to be amputated.

Horne sued Home Depot and Electric Eel in state court, bringing claims of negligence and breach of warranty against both defendants. He also brought a claim against Electric Eel for strict liability for producing a defective and dangerous product. Horne later added a claim against Home Depot for spoliation when the company lost the machine at issue months after Horne's lawyer asked the company to preserve it as evidence in Horne's civil action. The defendants removed the case to federal court and eventually moved for summary judgment.

In granting judgment in favor of Home Depot on the negligence and warranty claims, the court relied entirely on a broadly drafted exculpatory clause in the rental contract. The court concluded that the spoliation claim was "derivative" of Horne's other claims and failed because Horne could not demonstrate that the loss of the evidence was the proximate cause of his inability to prove his substantive claims. For the strict liability claim brought against Electric Eel, the court

found that Horne failed to produce expert or other evidence of a design or manufacturing defect in the machine that he used. The warranty claim failed for lack of contractual privity between Horne and Electric Eel. The court rejected the negligence claim against Electric Eel because Horne failed to raise a material issue of fact regarding the condition of the machine when it left the manufacturer's control.

After the court granted judgment in favor of the defendants, Horne filed a Rule 59 motion contending that the court misapplied the parties' burden of proof in summary judgment proceedings, misconstrued Illinois law, and improperly ignored material questions of fact that precluded summary judgment. The court denied the motion, concluding that Horne could have raised the issues earlier and also that he was simply recasting earlier arguments. Horne appeals.

## II.

On appeal, Horne asserts that the district court erred in granting judgment in favor of Home Depot on the basis of the exculpatory provision. That provision is unenforceable, he contends, because Home Depot materially breached the contract by providing him with a drain cleaner that was not in good working condition, contrary to an express promise in the agreement. He argues that the district court improperly placed the burden on him to disprove Home Depot's affirmative defense. In any case, Horne points out, the evidence regarding the condition of the machine was in conflict, and that alone should have precluded summary judgment. Horne also argues that the release and exculpatory provisions of the rental

contract are procedurally and substantively unconscionable.[3] He seeks to reassert his spoliation claim against Home Depot, contending that the company's loss of this evidence impaired his ability to prove that the device was defective. As for the judgment in favor of Electric Eel, Horne argues that the district court erred in ruling that his failure to present expert testimony was fatal to his claims, especially in light of testimony from Horne and his eye witnesses regarding the operation of the machine on the day of the accident. Finally, Horne maintains that the district court erred in quashing a subpoena issued to RGIS, LLC, a non-party that tracked inventory for Home Depot's tool rentals.

Home Depot responds that Horne waived his primary argument on appeal, namely, that the exculpatory clause was unenforceable because of Home Depot's material breach. If the argument was not waived, Home Depot argues in the alternative that the undisputed evidence demonstrates that the machine was in good working condition. Home Depot also asserts that the exculpatory clause is enforceable and not contrary to public policy under Illinois law, and that the spoliation claim was properly dismissed. Finally, Home Depot contends that the district court did not abuse its discretion in quashing the subpoena issued to RGIS because it was untimely.

---

[3] In the district court, Horne did not preserve an argument regarding procedural unconscionability, waiving the issue. He did contend that the contract violated public policy, a claim that he now seems to reframe as substantive unconscionability. We will address his public policy argument but any stand-alone assertion of substantive unconscionability was also waived.

Electric Eel maintains that Horne's factual admissions defeat his claim for negligent manufacturing, and that Horne lacks any evidence of defective design. Electric Eel also contends that any claims for breach of warranty fail because there is no contractual privity between Horne and Electric Eel, and because Horne lacks evidence supporting his claims.

**A.**

We review the district court's grant of summary judgment *de novo*, and as we noted above, we examine the record in the light most favorable to Horne and construe all reasonable inferences from the evidence in his favor. *Anderson*, 477 U.S. at 255; *McCottrell v. White*, 933 F.3d 651, 661–62 (7th Cir. 2019). Summary judgment is appropriate when there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); *Anderson*, 477 U.S. at 247–48; *McCottrell*, 933 F.3d at 662. "Although federal law governs procedure in a case in which federal court jurisdiction is premised on diversity of citizenship, state law applies to substantive issues." *Skyrise Constr. Group, LLC v. Annex Constr., LLC*, 956 F.3d 950, 956 (7th Cir. 2020); *Fednav Int'l, Ltd. v. Continental Ins. Co.*, 624 F.3d 834, 838 (7th Cir. 2010); *RLI Ins. Co. v. Conseco, Inc.*, 543 F.3d 384, 390 (7th Cir. 2008). "When neither party raises a conflict of law issue in a diversity case, the applicable law is that of the state in which the federal court sits." *RLI Ins.*, 543 F.3d at 390. No party raised a conflict of law issue here, and Illinois law therefore applies to the substantive issues.

Horne devotes much of his briefing to detailing alleged errors in analysis by the district court. "But since the review of

summary judgment is plenary, errors of analysis by the district court are immaterial; we ask whether we would have granted summary judgment on this record." *Thorn v. Sundstrand Aerospace Corp.*, 207 F.3d 383, 386 (7th Cir. 2000). *See also Tobey v. Extel/JWP, Inc.*, 985 F.2d 330, 332 (7th Cir. 1993) ("The question whether a movant is entitled to summary judgment is one of law—one therefore that we review *de novo*, which is to say without deference for the view of the district judge and hence almost as if the motion had been made to us directly."). With these standards in mind, we begin with Horne's argument that the exculpatory provision was unenforceable because Home Depot breached its primary obligation under the rental agreement.

**1.**

Because Home Depot asserts that Horne waived this argument regarding the company's material breach of the rental contract, we must first discuss the proceedings in the district court in some detail. Home Depot sought summary judgment on all of Horne's claims on the basis of exculpatory clauses in the rental contract. The primary exculpatory clause provides in relevant part:

> RELEASE, INDEMNIFICATION AND WAIVER OF DAMAGES. TO THE FULLEST EXTENT PERMITTED BY LAW, CUSTOMER INDEMNIFIES, RELEASES, WAIVES AND HOLDS THE HOME DEPOT HARMLESS FROM AND AGAINST ALL CLAIMS, LOSSES, EXPENSES (INCLUDING ATTORNEY'S FEES AND EXPENSES), LIABILITIES AND

> DAMAGES (INCLUDING PERSONAL INJURY, DEATH, PROPERTY DAMAGE, LOST PROFITS, AND SPECIAL, INCIDENTAL AND CONSEQUENTIAL DAMAGES) IN ANY WAY CONNECTED WITH THE EQUIPMENT, ITS OPERATION OR USE, OR ANY DEFECT OR FAILURE THEREOF OR A BREACH OF THE HOME DEPOT'S OBLIGATIONS HEREIN.

R. 151-3, ¶ 9. Home Depot also relied on an assumption-of-risk clause which provides, in relevant part:

> CUSTOMER LIABILITY. DURING THE RENTAL PERIOD, CUSTOMER ASSUMES ALL RISKS ASSOCIATED WITH AND FULL RESPONSIBILITY FOR THE POSSESSION, CUSTODY AND OPERATION OF THE EQUIPMENT, INCLUDING, BUT NOT LIMITED TO, RENTAL CHARGES, CUSTOMER TRANSPORT, LOADING AND UNLOADING, PROPERTY DAMAGES AND DESTRUCTION, LOSSES, PERSONAL INJURY, AND DEATH.

R. 151-3, ¶ 7. We will refer to these two provisions together as the "Exculpatory Clause." Horne contended below that, under Illinois law, a party who is in material breach may not take advantage of terms of the contract that benefit that party, and so the Exculpatory Clause could not be enforced against him because Home Depot materially breached the contract.

**2.**

In setting forth the nature of the material breach, Horne cited language from the "General Responsibilities" paragraph of the rental contract:

> The Home Depot will provide Customer the tool(s) identified on page 1 of this Agreement (the "Equipment") "as is" and in good working condition for the time ("Rental Period") and rental subtotal price identified on page 1 of this Agreement ("Rental Price").

R. 151-3, ¶ 1 (hereafter "Paragraph 1"). Horne asserted that Home Depot promised the new machine associated with the part number listed in the contract, but instead provided a machine that appeared "old, raggedy and rusty[.]" R. 170, at 2. He explained:

> Home Depot promised to provide Calvin [Horne] with the Model R drain cleaner in good working condition per the Tool Rental Agreement. … Instead, he received a drain cleaner with significant functional issues, such as: a pre-existing kink in the cable hidden to Calvin until after he started using it …; a reverse toggle switch that was faulty …; and, a foot pedal that malfunctioned when Calvin pressed down on it. … Home Depot failed to deliver on its promise to Calvin that the drain cleaner would be in good working condition.

R. 170, at 2–3 (citations to Horne's Statement of Material Facts omitted). He also asserted that the machine he received looked nothing like the rodders he had used in the past and nothing like the photographs of new Electric Eel models that Home Depot produced in discovery as exemplars of the machine they claimed to have provided. R. 170, at 2, 5. He could not recall what the "Model R" designation meant and noted that the rental contract itself listed only a part number that Home Depot subsequently held out to be associated with a newly assembled Electric Eel Model R.

In furtherance of his observation that the machine appeared old even though Home Depot claimed that it had been recently assembled, Horne inferred that Home Depot provided him with the "wrong machine." After asserting repeatedly that the machine he was given had a defective foot pedal, a defective forward/reverse toggle switch, and a pre-existing kink in the cable, Horne summed up the breach in the district court proceedings:

> Here, there is no doubt that Home Depot materially breached the contract by providing Calvin with the wrong drain cleaner which caused significant and permanent injuries due to the defective condition of the drain cleaner; as such, Home Depot must not be able to benefit from the terms of the contract, including enforcement of the alleged Exculpatory Clause.

R. 170, at 6. Horne provided variations on this theme that the Exculpatory Clause was unenforceable due to Home Depot's breach. For example, because the contract promised a machine

in good working order, he asserted that injuries caused by a defective machine were not within the scope of risks contemplated by the Exculpatory Clause. R. 170, at 10–11. Horne also argued that the exculpatory provisions of the contract contradicted the express promise to provide a machine in good working order, contrary to Illinois case law that holds that a party may not promise to act in a certain manner in one part of a contract and then exculpate itself from liability for breach of that very promise in another part of the contract. R. 170, at 10. Horne also claimed that the Exculpatory Clause violated public policy, and that the contract itself was silent about the risks and dangers of operating the machine, making no mention of the type of injury that Horne sustained. R. 170, at 6–9.

**3.**

In its reply, Home Depot asserted that, because Horne did not sue for breach of contract, his reliance on contract law was misplaced and had no bearing on the enforceability of the Exculpatory Clause.[4] The company made much of Horne's inference that he was provided the "wrong machine." Home

---

[4] Horne, of course, did not assert a stand-alone claim for breach of contract in his complaint. Instead, when Home Depot sought to take advantage of the contract's Exculpatory Clause, Horne asserted that the company could not benefit from that provision in light of its own material breach of the contract. As we discuss below, because Home Depot relied on a contractual defense, Horne was entitled to invoke contract law in disputing the applicability of the Exculpatory Provision to his claims for negligence and breach of warranty. Moreover, as the district court noted, Horne's claim for breach of warranty is a contract-based claim, and so a contract-based argument is appropriate.

Depot complained that, up to that point in the litigation, Horne had focused on being provided a defective Electric Eel machine, and was now taking the "contradictory position" that he was provided the "wrong drain cleaner." R. 178, at 3. Horne had alleged in his complaint that he rented an Electric Eel Model R drain cleaner and was operating that brand and model when he was injured. Because Horne received the drain cleaner listed in the contract, Home Depot denied that it materially breached the contract by providing "the wrong drain cleaner." R. 178, at 4. Home Depot also argued that the contract promised no particular model, and specified that the machine would be provided "as is." Horne, the company contended, accepted the machine in the condition in which it was presented and executed the contract by using the drain rodder. Home Depot urged the district court to reject any argument that it materially breached the contract because the contract promised only to deliver an electric rodder and Horne received an electric rodder. Home Depot asserted that it therefore "fully complied with and performed the agreed terms of the contract and demonstrated no material breach." R. 178, at 6–7.

**4.**

The district court accepted Home Depot's characterization of Horne's claim of breach of contract as being that he was provided the "wrong machine," and rejected that claim because Horne had already admitted that he received the machine described in the contract. Among the facts that the court deemed admitted were: (1) that Horne rented an Electric Eel Model R drain cleaner with part number 0448505995, (R. 171, ¶18); (2) that after signing the contract for that device, he returned to his home with that particular drain cleaner (R. 171,

¶26); and (3) that the Model R with part number 0448505995 was assembled, inspected and distributed to Home Depot by Electric Eel on May 2, 2017 (R. 171, ¶36). Having admitted as a factual matter that he received the very machine listed in the rental contract, the district court concluded that there was no breach for supplying the "wrong machine."

But the court erred in accepting Home Depot's characterization of Horne's argument regarding the nature of the breach. To be sure, Horne's summary judgment briefing in the district court was not a model of clarity. But the focus on the "wrong machine" inference led to a misapprehension of Horne's actual argument, as well as an unfounded claim by Home Depot that Horne "waived" his argument about breach of the "good working condition" clause:

> A true reading of plaintiff's response to Home Depot's motion for summary judgment reveals that it is completely devoid of any argument that Home Depot breached the Contract by failing to provide him with the Machine "in good working condition." Instead, he argued before the district court that Home Depot breached the Contract by "providing Calvin with the wrong drain cleaner."

Brief of Defendants-Appellees, at 18. That was not a "true reading" of Horne's response to Home Depot's motion for summary judgment.[5]

---

[5] Home Depot conceded that, "[i]n his response to Home Depot's motion,

(continued...)

In his district court response to Home Depot's motion, Horne repeatedly argued that Home Depot breached the contract's express promise to provide a machine in good working condition by supplying a device with a malfunctioning foot pedal, an inoperative forward/reverse toggle switch, and a pre-existing kink in the cable. R. 170, at 2–3, 3, 6, 10, 11–12.[6]

---

[5] (...continued)

plaintiff did argue that the wrong machine that he allegedly received was not in good working condition but only in support of his argument that the exculpatory clause in the contract violated Illinois public policy." Brief of Defendants-Appellees, at 18 n.1. Home Depot's attempt to limit this concession to a separate argument regarding public policy is not a fair reading of Horne's summary judgment brief as a whole.

[6] *See* R. 170, at 2–3 ("Home Depot promised to provide Calvin with the Model R drain cleaner in good working condition per the Tool Rental Agreement. … Instead, he received a drain cleaner with significant functional issues, such as: pre-existing kink in the cable …; a reverse toggle switch that was faulty …; and, a foot pedal that malfunctioned when Calvin pressed down on it."); at 3 ("Calvin's injuries were sustained because the foot pedal and reverse toggle switch failed to function properly, causing Calvin to have to manually reverse the kinked cable. Home Depot failed to deliver on its promise to Calvin that the drain cleaner would be in good working condition.") at 6 ("Here, there is no doubt that Home Depot materially breached the contract by providing Calvin with the wrong drain cleaner which caused significant and permanent injuries due to the defective condition of the drain cleaner; as such, Home Depot must not be able to benefit from the terms of the contract, including the enforcement of the Exculpatory Clause."); at 6 ("the other significant disputed fact is whether Calvin received a machine that was in good working condition as promised by Home Depot"); at 10 ("In one breath, Home Depot warrants to provide Calvin with a good working drain cleaner; and, in another breath, Home Depot attempts to

(continued...)

That Horne also characterized the rodder that was supplied as the "wrong machine" does not negate his many references to breach of the "good working condition" clause by providing a defective machine, an allegation for which he provided more than adequate support in his own statement of material facts. True, Horne's repetition of this argument in different formats under different section titles in his district court response is somewhat clumsy, but the issue was not waived. *Cf. United States v. Wanjiku*, 919 F.3d 472, 486 (7th Cir. 2019) (we may review arguments related to preserved claims, and a challenge below is sufficient to preserve an argument even if it is a new twist based upon additional authority on appeal); *Bew v. City of Chicago*, 252 F.3d 891, 895–96 (7th Cir. 2001) (we will usually address a new argument made in support of a claim raised below when the argument grows out of facts presented to the district court; once a claim is properly presented, "parties are not limited to the precise arguments they made below."). He thus preserved his argument that the Exculpatory Clause was unenforceable because Home Depot breached the "good

---

[6] (...continued)

exculpate itself from the obligation. … A party cannot promise to act in a certain manner in one portion of a contract and then exculpate itself from liability for breach of that very promise in another part of the contract."); at 11–12 ("the alleged Exculpatory Clause is contradicted by the promise to provide the drain cleaner in good working condition[.] Calvin clearly had the expectation that the drain cleaner would be in good working condition as implied by law. A jury could reasonably conclude that Calvin's [sic] did not foresee to be injured because of the" flaws in the device).

working condition" clause when it provided a defective machine.

Although Home Depot now supplies some citations to the record in support of its claim on appeal that the machine was in good working condition,[7] that evidence is disputed. For the purposes of summary judgment, therefore, we must assume that the machine had the three flaws asserted by Horne, regardless of how recently the device had been manufactured and delivered to the store. Because Horne did not waive his claim that Home Depot materially breached the "good working condition" clause of the contract by providing a defective machine, we turn to the merits of that claim.

**B.**

We begin by examining Illinois law to define the parameters of the dispute because, in addition to disagreeing about the facts, the parties disagree about the law that governs exculpatory clauses. Home Depot begins with the proposition

---

[7] Home Depot goes so far as to claim on appeal that the evidence that the machine was in good working condition is undisputed. This is incorrect. Horne, as we noted, provided testimony to the contrary, testimony that was corroborated by two eye witnesses. He also provided evidence from Home Depot's own records that the device was broken only days after it was delivered to the store. Home Depot's argument on this point is especially unwarranted because Home Depot took the position in the district court that the contract promised a drain rodder in "as is" condition, ignoring the "good working condition" clause and presenting no evidence in the district court regarding the condition of the machine. Home Depot instead argued below that there was no breach because it promised a drain cleaner and it provided a drain cleaner, without regard to the condition of the device.

that Horne's reliance on contract law to defend against summary judgment is misplaced because Horne did not bring a claim for breach of contract. But Home Depot founded its argument for summary judgment entirely on a contract-based affirmative defense, relying on Illinois contract law. Horne is entitled to defend against the motion for summary judgment by pointing out any legal errors and factual deficiencies in Home Depot's contract-based defense, and obviously, he may rely on contract law to do so. Moreover, as the district court pointed out, Horne's breach of warranty claim sounds in contract, undercutting the very premise of Home Depot's proposition, at least as to that claim. *See Collins Co., Ltd. v. Carboline Co.*, 532 N.E.2d 834, 838 (Ill. 1988) ("an express warranty is imposed by the parties to a contract and … an action for breach of express warranty is an action *ex contractu*.").

Horne is also correct that, under Illinois law, a party in material breach may not enforce a provision of a contract that is favorable to him, such as an exculpatory clause. *Dubey v. Public Storage, Inc.*, 918 N.E.2d 265, 284 (Ill. App. 2009) ("a party who materially breaches a contract cannot take advantage of the terms of the contract which benefit him"); *Goldstein v. Lustig*, 507 N.E.2d 164, 168 (Ill. App. 1987) (same); *Builder's Concrete Co. of Morton v. Fred Faubel & Sons, Inc.*, 373 N.E.2d 863, 870 (Ill. App. 1978) (same). *Cf. LB Steel, LLC v. Carlo Steel Corp.*, 122 N.E.3d 274, 290 (Ill. App. 2018) (party who commits first material breach may not recover damages for other party's subsequent breach, citing *Dubey*). And a party seeking to enforce a favorable provision has the burden of proving substantial compliance with the contract. *James v.*

*Lifeline Mobile Medics*, 792 N.E.2d 461, 464 (Ill. App. 2003) ("A party seeking to enforce a contract has the burden of proving he has substantially complied with all material terms of the agreement."); *Goldstein*, 507 N.E.2d at 167–68 (same). Thus, Home Depot may not rely on its Exculpatory Provision if it cannot ultimately prove that it substantially complied with its obligations under the contract. And summary judgment is not appropriate if there are factual disputes regarding Home Depot's substantial compliance with the rental agreement. To be sure, exculpatory clauses generally come into play once there has been a breach. But as we explain below, under Illinois law, an exculpatory clause may not relieve a party of material breach of an express promise at the core of the contract because that would render the contract illusory.

Public policy in Illinois "strongly favors freedom to contract," and therefore exculpatory clauses are generally enforced "'unless (1) it would be against a settled public policy of the State to do so, or (2) there is something in the social relationship of the parties militating against upholding the agreement.'" *Harris v. Walker*, 519 N.E.2d 917, 919 (Ill. 1988) (quoting *Jackson v. First Nat'l Bank*, 114 N.E.2d 721, 725 (Ill. 1953)). *See also Reuben H. Donnelley Corp. v. Krasny Supply Co.*, 592 N.E.2d 8, 11 (Ill. App. 1991) ("private parties to a contract may allocate the risk of negligence as they see fit and exculpatory clauses are not violative of public policy as a matter of law"). At the same time, exculpatory clauses are not favored in Illinois, and are to be strictly construed against the party they benefit, especially when that party was also the drafter, as is the case here. *Scott & Fetzer Co. v. Montgomery Ward & Co.*, 493 N.E.2d 1022, 1029 (Ill. 1986). "Such clauses

must spell out the intention of the parties with great particularity and will not be construed to defeat a claim which is not explicitly covered by their terms." *Scott & Fetzer*, 493 N.E.2d at 1029–30. Moreover, in Illinois, the construction, interpretation, or legal effect of a contract is a matter to be determined by the court as a question of law. *Avery v. State Farm Mut. Ins. Co.*, 835 N.E.2d 801, 821 (Ill. 2005). The "starting point of any contract analysis is the language of the contract itself." *Id*. We must construe a contract "as a whole, viewing particular terms or provisions in the context of the entire agreement." *Matthews v. Chicago Transit Auth.*, 51 N.E.3d 753, 776 (Ill. 2016).

**1.**

In moving for summary judgment, Home Depot contended that the Exculpatory Clause "clearly and unambiguously releases Plaintiff's claims against Home Depot." The company argued that the Exculpatory Clause was valid and enforceable because it did not violate public policy; there was no special relationship between the parties and no substantial disparity in the bargaining positions; and the type of injury the plaintiff suffered was reasonably foreseeable and contemplated by the parties. We will address these contentions in a moment, but we first note that Home Depot's motion and its argument failed to address or acknowledge other significant legal hurdles that a defendant must overcome in seeking the enforcement of an exculpatory clause.

For example, as we have just noted, a party in material breach may not take advantage of provisions in the contract that are favorable to it. *Dubey*, 918 N.E.2d at 284. In moving for

summary judgment, Home Depot made no attempt to demonstrate that it was not in breach. *James*, 792 N.E.2d at 464. When Horne raised this legal principle (and accompanying factual disputes) in his response to Home Depot's motion for summary judgment, the company responded that it was not in breach because it promised nothing more than a drain cleaner in "as is" condition and it had provided a drain cleaner. Home Depot also denied that it breached by supplying the "wrong" drain cleaner. Those responses ignored entirely Horne's references to the express promise in the first paragraph of the contract to provide a machine "in good working condition."

**2.**

That leads to the second deficiency in Home Depot's argument for summary judgment, namely, that the rental agreement contained ambiguous and even contradictory provisions on the promised condition of the device. The contract first confusingly promised to provide the rented equipment "'as is' and in good working condition." R. 151-3, ¶ 1. The phrase "as is" usually signifies that "the buyer takes the entire risk as to the quality of the goods involved and he must trust to his own inspection. Implied and express warranties are excluded in sales of goods 'as is.'" Black's Law Dictionary, Fifth Edition (1979). There is considerable ambiguity in promising to provide goods both "as is" and "in good working condition." In a later paragraph of the rental agreement, the company deepened the ambiguity as it attempted to disclaim all warranties, including, apparently, the express promise it made in the first paragraph:

> Customer acknowledge(s) acceptance of the
> Equipment "as is" and on a "where is" basis,
> with "all faults" and without any recourse
> whatsoever against The Home Depot.

R. 151-3, ¶ 8. The provision of goods with "all faults" means that the buyer accepts, "in the absence of fraud on the part of the vendor, all such faults and defects as are not inconsistent with the identity of the goods as the goods described." Black's Law Dictionary, Fifth Edition (1979).[8] In resolving the ambiguity of these provisions against the drafter, and in construing this language in the context of the entire agreement, we conclude that the initial express promise to provide the drain rodder in "good working condition" takes precedence over the limiting phrases "as is" and "with all faults." *Scott & Fetzer*, 493 N.E.2d at 1029–30. Home Depot thus may not disclaim liability for injuries that occur as a result of a breach of that express promise.

**3.**

This reading also resolves other objections that Horne raised to Home Depot's summary judgment motion. Citing to *Shorr Paper Products, Inc. v. Aurora Elevator, Inc.*, 555 N.E.2d 735 (Ill. App. 1990), and *Jewelers Mutual Ins. Co. v. Firstar Bank Illinois*, 820 N.E.2d 411 (Ill. 2004), Horne contended that Home Depot could not assume a specific duty (to provide a device in good working condition) in one part of a contract, and then

---

[8] The phrase "where is" generally means that the buyer (or renter) accepts the goods where they are and will transport them as needed. This term is irrelevant to the parties' dispute.

also exculpate itself from liability for breach of that core promise in another part of the contract (the Exculpatory Clause). In *Jewelers Mutual*, the plaintiffs were insurers of individuals and businesses that rented safety deposit boxes at a bank. The rental agreement contained a broad exculpatory clause, denying liability for loss of or injury to the contents of the box unless the lessee entered into a separate agreement with the bank to that effect. But the contract also provided that the "liability of said bank is limited to the exercise of ordinary care to prevent the opening of said safe by any person not authorized[.]" The bank conceded that it breached that provision of the contract, which led to the loss of jewelry and loose diamonds stored in the boxes. The bank nevertheless sought to enforce the exculpatory provision to limit its liability. The Illinois Supreme Court framed the issue as "whether defendant can exculpate itself from all liability for breach of an express obligation assumed in the contract." 820 N.E.2d at 414–15.

The Illinois Supreme Court found the agreement ambiguous because it sought to relieve the defendant of all liability in one sentence and assumed a particular liability in another sentence. But the Court found no need to resolve the ambiguity:

> Whatever the meaning of the exculpatory clause, it clearly cannot be applied to a situation in which defendant is alleged to have breached its duty to exercise ordinary care to prevent unauthorized persons from opening the box. This is a specific duty that defendant assumed in the contract, and it formed the heart of the parties' agreement. A party cannot promise to

> act in a certain manner in one portion of a contract and then exculpate itself from liability for breach of that very promise in another part of the contract.

*Jeweler's Mutual*, 820 N.E.2d at 415. That is because "focusing solely on exculpatory provision of contract to the exclusion of its specifically articulated obligations … would render [a] defendant's contractual duties illusory." *Jeweler's Mutual*, 820 N.E.2d at 415–16 (citing *Shorr Paper*, 555 N.E.2d at 738).[9] Here, the heart of the agreement and the primary obligation of Home Depot under the contract was to provide the rented equipment in good working condition. If Home Depot's breach of that

---

[9] *Shorr Paper* similarly held that the drafter of a contract could not exculpate itself from liability for breaching specific obligations delineated in an elevator maintenance contract. 555 N.E.2d at 737–38. The court first presumed that all contract "provisions were intended for a purpose, and conflicting provisions will be reconciled if possible so as to give effect to all of the contract's provisions." *Id*. In order to give meaning to both the exculpatory language and the specific obligations, the court found that the exculpatory clause relieved the defendant only from general responsibility for structural damage to the elevator. But the contract would not protect the defendant "from liability for any damages directly caused by its failure to perform its specified service obligations sufficiently." 555 N.E.2d at 738. This reading also prevented the defendant's duties "from becoming illusory and meaningless, a result which would be occasioned if [the defendant] were not liable for failing to perform its obligations sufficiently." *Id*. Moreover, the court's interpretation honored the rule to construe ambiguous or uncertain contracts against the drafter, a consideration the court found "particularly important when a party seeks to take advantage of a purported exception to an agreement." *Id*. Thus, a defendant may not exculpate itself from liability for injury resulting from the breach of a core promise in the contract.

core provision is the cause of the injury, then under *Jeweler's Mutual*, Home Depot may not exculpate itself from liability for that breach.

The district court found that the principle articulated in *Jeweler's Mutual* applied only to contract claims and was thus irrelevant to Horne's negligence claim, relying on *Geimer v. Bank of America, N.A.*, 784 F.Supp.2d 926, 934 (N.D. Ill. 2011). But *Geimer* supplies no support for this proposition. The plaintiff there cited *Jeweler's Mutual* in support of an argument that negligent failure to take appropriate security precautions against identity theft was a recognized basis for bank liability, over and above any contractual liability which may exist. The plaintiff was attempting to sidestep Illinois' *Moorman* rule, holding that plaintiffs may not recover for solely economic loss under tort theories of negligence and the like. The *Geimer* court rejected the applicability of *Jeweler's Mutual*, noting that the lower courts in *Jeweler's Mutual* had dismissed the plaintiff's negligence claim under the *Moorman* doctrine, and the Illinois Supreme Court had not disturbed that decision. Because Horne seeks damages for personal injury, the *Moorman* doctrine is inapplicable. And as we explained above, it is the defendants who seek to enforce the contract here and so Horne may turn to contract law to demonstrate why the Exculpatory Clause may not be enforced.

The district court similarly rejected the applicability of the *Jeweler's Mutual* principle to Horne's breach of warranty claim (which sounds in contract) because the rental agreement did not leave Horne without any remedy in the event of Home Depot's breach. Specifically, the contract provided:

> Should The Home Depot fail to meet any of its
> obligations under this Agreement, Customer's
> only remedy is repair or replacement of deficient
> Equipment or to receive, at The Home Depot's
> option, a rental charge adjustment.

R. 151-3, ¶ 3. In this case, that would mean that Horne's damages for loss of his finger would be limited to $63.80, the rental charge. In the district court, Home Depot did not respond to Horne's argument under *Jeweler's Mutual*, did not cite or rely on paragraph 3 of the rental agreement, and did not argue that Horne's damages were limited to refund of the rental amount. In light of that waiver, and given that Home Depot bore the burden of demonstrating its entitlement to summary judgment, that should have been the end of the matter.[10] Indeed, Home Depot makes no attempt on appeal to

---

[10] In finding that *Jeweler's Mutual* was distinguishable, the district court also cited *Willmott v. Federal Street Advisors, Inc.*, 2006 WL 3743716 (N.D. Ill. Dec. 19, 2006), for the proposition that the Exculpatory Clause was enforceable because it did not entirely exculpate Home Depot. But that analysis reads too much into *Willmott*, which enforced an exculpatory clause where the plaintiff was seeking *consequential* damages for a breach, a type of damages specifically excluded by the contract at issue. The court held that the defendant could still be held liable for direct damages. *Willmott*, 2006 WL 3743716, *8 ("public policy does not prohibit an exculpatory clause that limits remedies to a plaintiff but does not absolve the other party of liability. The exculpatory clauses in the Loan Agreements do not absolve BOA of liability or in any way limit direct damages from a breach by BOA. Instead, they limit the extent of Willmott's remedies. This important difference distinguishes *Jewelers Mutual Ins. Co. v. Firstar Bank Illinois*, the case upon which Willmott

(continued...)

defend the district court's *sua sponte* reliance on *Geimer* or *Willmott*.

Instead, Home Depot now cites paragraph 3 primarily as a means for resolving contradictory terms in the contract. Home Depot contends that paragraph 3 is a more specific provision regarding remedies that limits the reach of the more general Exculpatory Clause, and does not relieve Home Depot of all liability. Home Depot argues that, if the machine was not in good working condition, then Horne was entitled to its repair or replacement (or, presumably, as the agreement specifies, the return or adjustment of his $63.80 rental fee). This new argument attempting to reconcile the conflicting provisions of the rental agreement comes too late, and does not address Illinois law construing exculpatory clauses strictly against the drafter and against the party seeking to enforce them, which in both instances is Home Depot. As a secondary matter, Home Depot asserts without citation to any case law that Horne's reliance on *Jeweler's Mutual* and *Shorr Paper* is misplaced because paragraph 3 of the rental contract supplied him with a remedy and did not immunize Home Depot from all liability. Again, Home Depot did not present this argument to the district court, and it fails to account for Illinois law construing ambiguities strictly against the drafter. Finally, Home Depot fails to address why a provision purportedly limiting damages for breach of contract would apply to a claim for negligence. At

---

[10] (...continued)
relies."). In this case, Home Depot sought in the district court not to limit Horne's remedies but to entirely absolve itself of all liability for its breach of an express promise.

most, paragraph 3's limitation of remedies might apply to Horne's claim for breach of warranty (which sounds in contract), but not to the negligence claim. In any case, Home Depot made no argument in the district court regarding this clause and so waived this argument.

**4.**

Our reading harmonizing the conflicting provisions of the rental agreement also resolves another variation of Horne's opposition to Home Depot's motion for summary judgment, namely, that the injury he sustained was not within those contemplated by the Exculpatory Clause. *See* R. 170, at 11–12 (arguing that Horne did not assume the risk of using a defective drain cleaner, in light of the contract's promise to provide a machine in good working condition). Courts closely scrutinize liability release clauses because they are disfavored under Illinois law, and they are strictly construed against the party seeking to rely on them. The parties need not contemplate the precise occurrence that later results in injury, but the defendant must put the plaintiff on notice of the range of dangers for which the plaintiff assumes the risk of injury. *Hawkins v. Capital Fitness, Inc.*, 29 N.E.3d 442, 447 (Ill. App. 2015). Under the contract, Horne assumed the risks of operating a machine in good working condition. But because of the "good working condition" clause, he did not assume the risks of operating a machine with flaws in its basic functioning. Because Horne has evidence that three key features of the machine were defective and because a jury could infer that those defects caused his injuries, he is entitled to take his case against Home Depot to trial. And because his substantive

claims may go forward, so too may his derivative spoliation claim.

**5.**

This is not to say that exculpatory clauses in general or the specific one at issue here are toothless. Horne must prove at trial that the machine was not in good working condition and that the alleged flaws in the machine were the cause of his injuries. Reading the Exculpatory Clause in the context of the whole agreement, Home Depot is not liable for injuries caused by a machine in good working condition. Most power tools come with inherent risks. If the device was not flawed and a customer nevertheless lost a finger, or suffered some other injury to her person or property, her remedies would be limited to repair or replacement of the machine, or adjustment of the rental fee.

**C.**

We promised earlier that we would also address whether the Exculpatory Clause here violates Illinois public policy. Because we have read the Exculpatory Clause narrowly as required by Illinois law, we conclude that it does not violate public policy. That is, because the Clause does not exculpate Home Depot for breach of the core promise in the contract, it is enforceable. As we noted above, exculpatory clauses are generally enforced "unless (1) it would be against a settled public policy of the State to do so, or (2) there is something in the social relationship of the parties militating against upholding the agreement." *Harris*, 519 N.E.2d at 919; *Jackson*, 114 N.E.2d at 725. Moreover, the clause must spell out the intention of the parties with great particularity and will not be

construed to defeat a claim which is not explicitly covered. *Scott & Fetzer*, 493 N.E.2d at 1029–30. In moving for summary judgment, Home Depot argued that nothing in the clause violated public policy, that there was no special relationship between the parties that would preclude enforcement, and that the type of injury suffered was reasonably foreseeable and within the scope of the Exculpatory Clause. Horne responded in the district court that the provision violates public policy as expressed in the Uniform Commercial Code (as adopted by Illinois at 810 ILCS 5/2-314), that there was a substantial disparity in the bargaining positions between Horne as an individual and Home Depot as a large corporation, and that the injury was not reasonably contemplated by the parties because Horne did not assume the risk of operating a faulty machine.

We have already addressed Horne's last point by holding that the rental agreement may not exculpate Home Depot for injuries that result from breach of its core obligation to provide a machine in good working condition. We now conclude that, with the limits we have placed on this Clause, enforcement would not violate public policy in Illinois. Illinois allows private parties to a contract to allocate the risk of negligence, and exculpatory clauses are not, in and of themselves, violative of public policy as a matter of law. *Reuben H. Donnelley*, 592 N.E.2d at 11. "In the absence of legislation to the contrary, courts will not interfere with contracts containing exculpatory clauses, unless there is a defect in the contract negotiation process such that a disparity in bargaining power denied a party a meaningful choice." *Id*. *See also Progressive Universal Ins. Co. of Ill. v. Liberty Mut. Fire Ins. Co.*, 828 N.E.2d 1175, 1180 (Ill.

2005) (an agreement will not be invalidated on public policy grounds unless it is clearly contrary to what the constitution, the statutes or the decisions of the courts have declared to be the public policy or unless it is manifestly injurious to the public welfare).

Horne's reliance on Section 2-314 of the commercial code as support for his public policy argument is unavailing. That section provides for an implied warranty of merchantability for goods "unless excluded or modified." *See* 810 ILCS 5/2-316 ("Exclusion or modification or warranties"). The express terms of the statute thus contemplate that parties to a contract may bargain away rights to an implied warranty of merchantability. So long as the parties comply with the terms of section 2-316 in modifying or excluding a warranty, such a provision would not violate Illinois law and may not provide a basis for a claim that the agreement violates public policy. Horne failed to account for section 2-314's language allowing exclusions or modifications under section 2-316. The commercial code does not support Horne's claim that the Exculpatory Clause was contrary to state law.

Finally, Horne's generic "David and Goliath" argument regarding the relative bargaining position of the parties is not the sort of disparity that violates public policy under Illinois law. Bargaining relationships that potentially violate public policy include those between an employer and employee; between the public and those charged with a duty of public service, such as involving a common carrier, an innkeeper, a public warehouseman or a public utility; and between parties where there is such a disparity of bargaining power that the agreement does not represent a free choice on the part of the

plaintiff, such as a monopoly or involving a plaintiff without a reasonable alternative. *White v. Village of Homewood*, 628 N.E.2d 616, 619–20 (Ill. App. 1993) (citing Restatement (Second) of Torts § 496B, comments e-j, at 567–69 (1965)). Horne's suggestion that he was pressured by the serious nature of his plumbing problem is insufficient to demonstrate that he was deprived of free choice. He does not suggest, for example, that he had no other options, that he could not hire a plumber, or rent a machine elsewhere under better terms. The record demonstrates that, after this incident he did in fact hire a plumber to fix the issue. Because he had other options, and because he did not have the type of special relationship with Home Depot that Illinois courts have referenced, he cannot establish that the Exculpatory Clause violated public policy.

## D.

Horne's case against Electric Eel is a different matter entirely, both factually and legally. Horne brought claims against Electric Eel for negligence, strict products liability, and breach of express and implied warranties. Although his complaint alleged many different acts of negligence and types of faults with the device, in opposing Electric Eel's motion for summary judgment, Horne pointed to the malfunctioning foot pedal and toggle switch as the defects that caused his injuries. Yet he conceded that, because the drain cleaner is no longer available for inspection, "it is impossible to determine the specific malfunction of this machine as it existed on July 21, 2017." R. 166, at 4. He asserted that Electric Eel was negligent in failing to properly inspect and test the defective product but failed to supply record support for this assertion or even explain how the company's inspections and tests were

inadequate. He also argued that Electric Eel warned of the dangers presented by kinked cables, and yet once the cable became kinked, the manufacturer, "seemingly, left Calvin with no alternative in its design other than to manually pull the kinked cable from the drain as the toggle switch and foot pedal both did not work properly. Had there been another safeguard in place, Calvin would not have had to manually pull the cable from the drain." *Id*. He conclusorily claimed that he could therefore show that he was injured by a drain cleaner that was unreasonably dangerous at the time it left the control of Electric Eel.

In Illinois, an injured plaintiff may allege two types of products liability claims: negligence and strict liability. *Salerno v. Innovative Surveillance Tech., Inc.*, 932 N.E.2d 101, 108 (Ill. App. 2010). Horne has alleged both. "[T]o recover in a strict product liability action, a plaintiff must plead and prove that the injury complained of resulted from a condition of the product, that the condition was unreasonably dangerous, and that it existed at the time the product left the manufacturer's control." *Mikolajczyk v. Ford Motor Co.*, 901 N.E.2d 329, 335 (Ill. 2008). For his negligence claim, Horne must establish the existence of a duty of care owed by the defendant, a breach of that duty, an injury proximately caused by that breach, and damages resulting from the breach. *Salerno*, 932 N.E.2d at 111 (citing *Calles v. Scripto-Tokai Corp.*, 864 N.E.2d 249, 263 (Ill. 2007)). For a breach of warranty claim based on a product defect, a plaintiff must prove, among other things, that the purported defect existed when the product left the manufacturer's control. *Alvarez v. American Isuzu Motors*, 749 N.E.2d 16, 22 (Ill. App. 2001).

Common to each of these claims is the need for Horne to demonstrate that there was a defect in the device at the time it left Electric Eel's control. Also for each of these claims, Horne must also demonstrate that the alleged defect caused his injury:

> Under Illinois law, in a products liability action, whether based on strict liability or negligence, the plaintiff must demonstrate a causal relationship between the injury and the manufacturer's product. … The causal relationship can be proven by circumstantial evidence. … But in order to get to the jury, the plaintiff must demonstrate more than a mere possibility that the product caused the injury. … Rather, the plaintiff must come forward with evidence justifying an inference of probability.

*Thornton v. M7 Aerospace LP*, 796 F.3d 757, 770 (7th Cir. 2015).

As it did in analyzing the claims against Home Depot, the district court again rejected Horne's unsupported denial that he received the device listed in the contract, and so we will again assume that Horne received the device that Electric Eel manufactured and delivered to the Home Depot store on May 2, 2017. In its Rule 56.1 statement of material facts, Electric Eel submitted testimony from Richard Berry, the employee who assembled and tested the device before it was shipped to Home Depot. Berry testified that he personally assembled and tested the machine that was listed in Horne's rental contract before it was delivered to the Homewood Home Depot. When he completed assembly, Berry tested the operation of the device, including the foot pedal and the forward/reverse toggle

switch. He testified that the machine had no defects when it was shipped out, that it was in "pristine, perfect condition," and that he would not have sent it out if there had been any issues with it.

Horne responded to this statement with, "Deny. There were other defects present." Horne did not cite any record evidence to support either his bald denial or his assertion that there were defects present when Electric Eel shipped the device. In fact, Horne did not supply references to the record in support of any of his denials in his response to Electric Eel's statement of material facts, and so the district court deemed Horne to have admitted Electric Eel's version of the facts to the extent they were properly supported. Electric Eel's assertion that there were no defects in the device when it left the company's control is well-supported by Berry's testimony. Horne also failed to produce any evidence that Electric Eel's actions (or omissions) were the cause of his injury. And he failed to produce any evidence regarding the alleged design defect, offering only speculation that some unspecified safer design would have prevented his injuries. *See Salerno*, 932 N.E.2d at 111 (manufacturer's duty to design reasonably safe products does not require the product to reflect the safest design possible; the question is not whether the product could have been made safer, but whether it is dangerous because it fails to perform in the manner reasonably to be expected in light of its nature and intended function). In any case, speculation that the device could have incorporated more safety features is inadequate to demonstrate that Electric Eel's action or inaction was the cause of his injuries.

Although Horne may be correct that not all product liability cases require expert testimony to prove that a product was defective and that the defect existed when the product left the manufacturer's control, the alternative under Illinois law is to demonstrate that, *in the absence of abnormal use or reasonable secondary causes* the product failed to perform in the manner reasonably to be expected in light of its nature and intended function. *DiCosolo v. Janssen Pharm., Inc.*, 951 N.E.2d 1238, 1244 (Ill. App. 2011). But Horne has failed to produce any evidence regarding the absence of abnormal use or reasonable secondary causes. In a case where the record shows that the product was rented out twenty-four times after it left the manufacturer's control and before the plaintiff was injured, the plaintiff must produce *some* evidence from which a court could infer the absence of abnormal use or reasonable secondary causes. Horne's claims against Electric Eel fail for lack of evidence tying the company to his injuries.

### E.

Finally, Horne appeals the district court's grant of a motion to quash a subpoena issued to RGIS, LLP. This court reviews a district court's grant or denial of a motion to quash a subpoena for abuse of discretion. *Mitchell v. City of Chicago*, 862 F.3d 583, 586 (7th Cir. 2017). Near the close of discovery, Horne learned that Home Depot had hired RGIS to inventory tools that the store rented out. Believing that RGIS had information that could assist him in locating the missing machine or in proving the spoliation claim, Horne attempted to subpoena RGIS, seeking inventory reports and other documents. RGIS notified Horne's counsel that the subpoena had not been sent to the company's registered agent. Horne's counsel then reissued the

subpoena shortly after discovery closed, without seeking leave of court. Home Depot moved to quash the subpoena, and after a brief hearing, the district court granted the motion, finding that it was not timely issued. On appeal, Horne asserts that the district court abused its discretion in quashing the subpoena because Home Depot lacked standing to object to a subpoena issued to a third party. But Horne failed to raise this objection in the district court, and the court acted well within its discretion in quashing the late-filed discovery request.

## F.

Before closing, we respond briefly to our dissenting colleague. Like the district court, the dissent concludes that the final sentence of paragraph 3 of the rental agreement limits Home Depot's liability for failing to provide a machine in good working order to repair or replacement of the machine, or an adjustment to the rental charge of $68.30. That clause, the dissent contends, keeps the agreement from being rendered illusory because Home Depot "is not completely off the hook for a breach." Because of the availability of this limited remedy, the dissent finds *Jewelers Mutual* inapplicable.

But Home Depot waived any reliance on this contract provision by failing to cite it, rely on it, or develop any argument using it in any manner in the district court even though Horne asserted that the company was in breach, and invoked *Jewelers Mutual*. In fact, in the district court, Home Depot simply denied that it breached the contract, and the company failed entirely to respond to Horne's argument under *Jewelers Mutual* and *Shorr Paper*. Arguments not raised in the district court are waived. *Savory v. Cannon*, 947 F.3d 409, 430

(7th Cir. 2020); *Milwaukee Ctr. for Independence, Inc. v. Milwaukee Health Care, LLC*, 929 F.3d 489, 493–94 (7th Cir. 2019). Even on appeal, Home Depot continues to rely primarily on its claim that it may enforce the Exculpatory Provision because it did not breach the contract, although the company now acknowledges that it might need to show more than that it provided a drain cleaner in "as is" condition. Having ignored Horne's argument entirely in the district court, Home Depot makes only a cursory and incomplete effort to respond to *Jewelers Mutual* on appeal.

Rather than treating these failings as a waiver, the dissent treats this new argument as preserved because the district court constructed the argument for Home Depot. But under the principle of party presentation, courts generally do not craft new arguments for a party, especially in civil cases and especially when the party is represented by counsel:

> In our adversarial system of adjudication, we follow the principle of party presentation. As this Court stated in *Greenlaw v. United States*, 554 U.S. 237, 128 S.Ct. 2559, 171 L.Ed.2d 399 (2008), "in both civil and criminal cases, in the first instance and on appeal …, we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present." *Id.*, at 243, 128 S.Ct. 2559. In criminal cases, departures from the party presentation principle have usually occurred "to protect a pro se litigant's rights." *Id.*, at 244, 128 S.Ct. 2559; see, *e.g.*, *Castro v. United States*, 540 U.S. 375, 381–383, 124 S.Ct. 786, 157 L.Ed.2d 778

(2003) (affirming courts' authority to recast pro se litigants' motions to "avoid an unnecessary dismissal" or "inappropriately stringent application of formal labeling requirements, or to create a better correspondence between the substance of a pro se motion's claim and its underlying legal basis" (citation omitted)). But as a general rule, our system "is designed around the premise that [parties represented by competent counsel] know what is best for them, and are responsible for advancing the facts and argument entitling them to relief." *Id.*, at 386, 124 S.Ct. 786 (Scalia, J., concurring in part and concurring in judgment).

*United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020).

Again, Home Depot never once in the district court relied on the limitation of remedies provision. This well represented corporation is not in need of our assistance in crafting arguments for summary judgment, yet the district court and now the dissent risk our role as neutral arbiters to become advocates for one side of this dispute. It is not our role to save a party from the consequences of drafting ambiguous or contradictory contract terms, or failing to advance arguments that may be advantageous. Moreover, a company may decide for strategic business reasons not to pursue legal arguments that may be available to them. It is not difficult to imagine that Home Depot made a strategic choice **not** to raise the refund-is-sufficient-remedy argument in the district court because of the message that this would deliver to potential customers. Imagine the marketing: "Whether you lose a finger, a hand, or

an arm, you can rest assured we will return your rental fee!"
We risk overruling a company's business judgment when we
intervene and advance new arguments on behalf of a party.

But in any case, this provision does little to save the primary
promise in the contract from becoming illusory, and perhaps
that is why Home Depot did not advocate this position itself
until the district court fashioned the argument. *Jewelers Mutual*
rejected the idea that a return of the rental fee could relieve the
bank of liability for breaching a duty it expressly assumed:

> In this contract, in exchange for plaintiff's rental
> fee, defendant assumed the obligation to
> exercise ordinary care to prevent unauthorized
> access to the safety deposit box. Having
> assumed this duty, defendant cannot exculpate
> itself from liability for a breach of that duty.
> Accepting defendant's argument would mean
> that, if defendant routinely breached these safety
> deposit box rental agreements by handing the
> keys to anyone who came in off the street and
> asked for them, it would have no liability to its
> customers except to give them their rental fee
> back. It is safe to assume that, if defendant
> explained the agreement this way in the
> contract, defendant would not have many safety
> deposit box customers.

*Jewelers Mutual*, 820 N.E.2d at 416–17.

A return of the rental fee arguably compensates the renter
for a complete failure to provide a drain rodder, and leaves the
renter in no worse position than if he had never rented the

product. But return of the rental fee provides no compensation for the breach of the express promise to provide the machine in good working condition. That promise implies a duty to inspect the device using ordinary care before supplying it to a renter. Under the dissent's reading, Home Depot could promise to provide a machine in good working condition, knowingly or negligently provide it in a dangerous condition, and then limit any damages claim to $68.30. Indeed, it is unclear how far this reading could extend: could a contract provision limiting damages to one dollar remove an agreement from the realm of *Jewelers Mutual* and insulate Home Depot from liability for knowingly or negligently providing a machine in poor (and potentially dangerous) condition? Such a reading of the contract would render the express promise to provide the machine in good working condition illusory under *Jewelers Mutual*.

Moreover, although the contract purports to absolve Home Depot from all liability for breach of the contract (which it may not do without rendering the express promise of the contract illusory), nothing in the contract limits remedies for the company's negligence in failing to supply a machine in good working condition. To be sure, Home Depot could have exercised ordinary care in inspecting the machine, and missed some latent defect. As we explained above, Home Depot would not be liable under those circumstances. The dissent seems to go farther and assume not only that this *could* happen (*i.e.* that the company could exercise ordinary care and miss a latent defect) but that it actually *did* happen here. But there are disputed issues of material fact as to whether Home Depot exercised ordinary care in inspecting the  machine it rented to

Horne, and only a jury can resolve those issues. As we noted earlier, a party seeking to enforce a favorable provision has the burden of proving substantial compliance with the material terms of the contract. *James*, 792 N.E.2d at 464; *Goldstein*, 507 N.E.2d at 167–68.

Although Illinois law allows parties to bargain away their rights, it reads exculpatory clauses narrowly, and against the drafter. This contract was anything but clear, and its ambiguous and contradictory language does not protect Home Depot to the degree afforded by the district court or the dissent.

## III.

Because Horne has raised genuine issues of material fact regarding whether Home Depot breached the contract by failing to provide a drain cleaner in good working condition, we vacate the judgment in favor of Home Depot and remand for proceedings consistent with this opinion. We affirm the judgment in favor of Electric Eel, and we also affirm the court's ruling on the RGIS subpoena. Because we vacate the judgment in part, we also vacate the district court's award of costs to the defendants as prevailing parties, and remand for reconsideration as to Electric Eel, which remains a prevailing party.

AFFIRMED IN PART
AND VACATED AND REMANDED IN PART.

SCUDDER, *Circuit Judge*, dissenting in part. I join all parts of the majority opinion except the analysis and conclusion regarding Horne's breach-of-warranty and negligence claims against Home Depot. In my view, any damages available for Horne's breach-of-warranty claim are limited by the rental agreement's Limited Liability Clause. And as for Horne's negligence claim, the Exculpatory Clause bars him from recovering damages for his injury.

**I**

**A**

Starting with the breach-of-warranty claim, all agree that Horne's claim sounds in contract. Under Illinois law, "[a] party cannot promise to act in a certain manner in one portion of a contract and then exculpate itself from liability for breach of that very promise in another part of the contract." *Jewelers Mut. Ins. Co. v. Firstar Bank Ill.*, 820 N.E.2d 411, 415 (Ill. 2004). Doing so renders the contract illusory. See *id.* at 415–16 (citing *Shorr Paper Prods., Inc. v. Aurora Elevator, Inc.*, 555 N.E.2d 735, 738 (Ill. App. Ct. 1990); and *Contact Lenses Unlimited, Inc. v. Johnson*, 531 N.E.2d 928, 931 (Ill. App. Ct. 1988)). The majority and I agree on this basic legal principle. So far, so good.

But the majority then relies on an Illinois Supreme Court decision, *Jewelers Mutual*, to conclude that applying the Exculpatory Clause to Horne's breach-of-warranty claim would make Home Depot's rental agreement illusory. It is at this point that our paths diverge. Based on my reading of the rental agreement, Home Depot provides customers a remedy—albeit a limited one—in the event the company breaches its obligation to provide equipment in "good working condition." Because Home Depot does not entirely exculpate itself

in the event of this contractual breach, the rental agreement does not contain illusory promises.

As the majority explains, the plaintiffs in *Jewelers Mutual* "were insurers of individuals and businesses that rented safety deposit boxes at a bank." Maj. Op. 25. The rental agreement included a clause providing that the "customer assumes all risks of depositing the contents of the box with defendant and that there 'shall be no liability on the part of said bank, for loss of, or injury to, the contents of said box from any cause whatever.'" *Jewelers Mut.*, 820 N.E.2d at 414–15. The next sentence of the rental agreement, however, indicated that the bank assumed "one particular liability"—that of exercising "ordinary care to prevent the unauthorized opening of the box." *Id.* at 415. The Illinois Supreme Court explained that the two clauses could not be reconciled because "[a] party cannot promise to act in a certain manner in one portion of a contract" by promising to exercise ordinary care but then completely "exculpate itself from … that very promise" which "formed the heart of the parties' agreement." *Id.* And the situation was not one, the court explained, where, "in the event of a breach, the plaintiff's damages are limited to a return of the rental fee." *Id.* In the end, then, *Jewelers Mutual* held that the "exculpatory provision is not applicable to an allegation that defendant breached its [contractual obligation]," so the plaintiff could seek damages for the breach. *Id.* at 417.

*Jewelers Mutual* would apply to Home Depot's rental agreement if the Exculpatory Clause totally and completely eliminated liability for failing to provide the rental equipment in "good working condition." Indeed, the majority adopts this

exact position. But that view proves untenable because it focuses only on the Exculpatory Clause without regard to the Limited Liability Clause, which provides:

> Should The Home Depot fail to meet any of its obligations under this Agreement, Customer's only remedy is repair or replacement of deficient Equipment or to receive, at The Home Depot's option, a rental charge adjustment.

R. 151-3, at ¶ 3.

The majority treats Home Depot as having waived any reliance on the Limited Liability Clause. Though the majority is correct that Home Depot did not reference the Limited Liability Clause in its summary judgment papers, the district court discussed the clause in its order granting Home Depot's motion for summary judgment. More specifically, the district court recognized that "the exculpatory clause, when read together with the provision in Paragraph 3, limits Home Depot's contractual liability but does not entirely exculpate Home Depot." *Horne v. Home Depot U.S.A., Inc.*, 2019 WL 556709, at *5 (N.D. Ill. Feb. 12, 2019). In my view, the district court's reference to and reliance on the Limited Liability Clause means there is no waiver here. See *United States v. City of Chicago*, 869 F.2d 1033, 1036 (7th Cir. 1989) ("It is folly for [a party] to assert that an appeals court on review of a district court judgment cannot consider the merits of each and every theory that the district judge relied upon in deciding the case."). Moreover, under Illinois law we must construe the one-page rental agreement "as a whole, viewing particular terms or provisions in the context of the entire agreement." *Matthews v. Chi. Transit Auth.*, 51 N.E.3d 753, 776 (Ill. 2016); see *id.* (explaining contracts should not be interpreted "by

viewing a clause or provision in isolation"). Moreover, "where both a general and a specific provision in a contract address the same subject, the more specific clause controls." *Grevas v. U.S. Fid. & Guar. Co.*, 604 N.E.2d 942, 944 (Ill. 1992).

Reading the rental agreement as a whole, the general Exculpatory Clause combined with the more specific Limited Liability Clause do not entirely exculpate Home Depot from liability. Rather, the rental agreement allows Horne to recover limited damages. Home Depot, in short, is not completely off the hook for a breach: because the Limited Liability Clause applies to Horne's contractual claim, the Exculpatory Clause does not render the rental agreement illusory. So *Jewelers Mutual* does not govern.

In charting a different course, the majority opinion lists cases to support the proposition that "a party in material breach may not enforce a provision of a contract that is favorable to him, *such as an exculpatory clause*." Maj. Op. 20 (emphasis added). What these cases ultimately seem to be getting at, however, is the settled principle that a party cannot maintain a suit for damages for breach of contract when the complaining party is also in breach. See *Robinhorne Constr. Corp. v. Snyder*, 251 N.E.2d 641, 645–46 (Ill. App. Ct. 1969) (citing *Glenridge Coal Co. v. Marion County Coal Co.*, 205 Ill. App. 264, 265 (Ill. App. Ct. 1917) ("An action for breach of a contract cannot be maintained where the complaining party is in default."); and *Consumers Mut. Oil Co. v. W. Petroleum Co.*, 216 Ill. App. 382, 385 (Ill. App. Ct. 1920) ("[A] party suing for damages for a breach of a contract must not only aver but prove he is not himself in default as to the agreement for the breach of which the suit is brought ….")). Indeed, of all five cases relied on by

the majority, none holds that a breaching party may not defend itself by relying on the contract's exculpatory clause, absent some other reason rendering the clause unenforceable. See, *e.g.*, *Dubey v. Pub. Storage, Inc.*, 918 N.E.2d 265, 276 (Ill. App. Ct. 2009) (explaining that a damages limitation clause was unenforceable on unconscionability grounds and because it violated Illinois's Landlord and Tenant Act). Even the majority opinion seems to acknowledge the limitations of its analysis by recognizing that exculpatory clauses only "generally come into play once there has been a breach." Maj. Op. 21.

Assuming Horne can prove that Home Depot failed to provide the drain-rodding machine in good working order, his remedy for the contractual breach should be limited to "repair or replacement" of the machine, or at Home Depot's option, a rental charge adjustment of $63.80. I would remand to the district court with instructions that the remedy for the breach-of-warranty claim cannot deviate from or exceed the compensation allowed by the Limited Liability Clause.

B

Next up is the negligence claim. The majority opinion offers no real distinction in its analysis of Horne's contract and negligence claims. Rather, the majority concludes that because nothing in paragraph 3's Limited Liability Clause applies to claims for negligence, Horne can proceed to trial on his tort claim. But because I read the Exculpatory Clause's language in paragraph 9 as applying to claims that sound in negligence, I would treat Horne's contract and tort claims as distinct from one another.

Lessors of equipment generally owe a duty of care to those expected to use the equipment. The leading Illinois case discussing negligence claims in this context is *Huckabee v. Bell & Howell, Inc.*, 265 N.E.2d 134 (Ill. 1970). The plaintiff in *Huckabee* suffered a fractured jaw and broken wrists after the scaffolding on which he was standing tipped and fell to the ground. *Id.* at 136. *Huckabee* explained that, in cases involving leased equipment, a bailor may be liable to a third person if:

> (1) [H]e supplied the chattel in question, (2) the chattel was defective at the time it was supplied, (3) the defect could have been discovered by a reasonable inspection, when inspection is required (I.e., where the danger of substantial harm because of a defect is great, as we deem it is here), and (4) the defect was the proximate cause of the injury.

*Id.* at 137 (citing *Chambliss v. Walker Constr. Co.*, 197 N.E.2d 83, 86 (Ill. App. Ct. 1964) (defective truck); and *Witt v. John Hennes Trucking Co.*, 199 N.E.2d 231, 234 (Ill. App. Ct. 1964) (defective crane)). Section 408 of the Restatement (Second) of Torts, which Illinois courts apply, similarly provides that "[o]ne who leases a chattel as safe for immediate use is subject to liability to those whom he should expect to use the chattel … if the lessor fails to exercise reasonable care to make it safe for such use or to disclose its actual condition to those who may be expected to use it." Restatement (Second) of Torts § 408 (Am. L. Inst. 1965); see, *e.g.*, *Brobbey v. Enter. Leasing Co. of Chi.*, 935 N.E.2d 1084, 1093–94 (Ill. App. Ct. 2010) (applying section 408). Comment (a) to section 408 then adds this instruction:

> *When lessor must inspect.* The fact that a chattel is leased for immediate use makes it unreasonable

> for the lessor to expect that the lessee will do more than give it the most cursory of inspections. The lessor must, therefore, realize that the safe use of the chattel can be secured only by precautions taken by him before turning it over to the lessee. … *If the chattel is made by a third person, the lessor is required to exercise reasonable care to inspect it before turning it over to the lessee.*

Restatement (Second) of Torts § 408 cmt. a (second emphasis added).

Notwithstanding this default duty that lessors owe to lessees, parties may generally contract around liability for negligence. Illinois law is clear on the point. "Public policy strongly favors freedom to contract, as is manifest in both the United States Constitution and [the Illinois] constitution." *McClure Eng'g Assocs., Inc. v. Reuben H. Donnelley Corp.*, 447 N.E.2d 400, 402 (Ill. 1983) (citation omitted). Under Illinois law, a party may contract to avoid liability for its own negligence and, absent fraud or willful and wanton negligence, the contract will be valid and enforceable unless: (1) there is a substantial disparity in the bargaining position of the two parties; (2) enforcing the contract would violate public policy; or (3) something in the social relationship between the parties militates against upholding the contract. See *Garrison v. Combined Fitness Ctr., Ltd.*, 559 N.E.2d 187, 189–90 (Ill. App. Ct. 1990); see also Restatement (Second) of Contracts § 195 (Am. L. Inst. 1981) (listing situations in which a contract term that exempts a party from tort liability is unenforceable on public policy grounds); Restatement (Second) of Torts § 496B ("A plaintiff who by contract or otherwise expressly agrees to accept a risk of harm arising from the defendant's negligent or reckless conduct

cannot recover for such harm, unless the agreement is invalid as contrary to public policy.").

The underlying rationale for these principles is that "courts should not interfere with the right of two parties to contract with one another if they freely and knowingly enter into the agreement." *Garrison*, 559 N.E.2d at 190. The majority concludes, and I agree, that none of the three exceptions renders the rental agreement's Exculpatory Clause unenforceable. Indeed, Illinois law allows parties to allocate the risk of negligence through use of exculpatory clauses, see *Reuben H. Donnelley Corp. v. Krasny Supply Co.*, 592 N.E.2d 8, 11 (Ill. App. Ct. 1991), and as the majority explains, Horne's "David and Goliath" argument regarding his bargaining position as compared to Home Depot's "is not the sort of disparity that violates public policy under Illinois law." Maj. Op. 33. Nor did Horne have any type of special relationship with Home Depot that Illinois courts have identified as violating public policy.

To be sure, exculpatory clauses "do not enjoy special favor" under Illinois law. *Meyers v. Rockford Sys., Inc.*, 625 N.E.2d 916, 921 (Ill. App. Ct. 1993). They must be strictly construed against the benefitting party, especially when that party drafted the release. See *Harris v. Walker*, 519 N.E.2d 917, 919 (Ill. 1988). "Such clauses must spell out the intention of the parties with great particularity and will not be construed to defeat a claim which is not explicitly covered by their terms." *Scott & Fetzer Co. v. Montgomery Ward & Co.*, 493 N.E.2d 1022, 1029–30 (Ill. 1986). Illinois law does not require the "precise occurrence which results in injury" to have been contemplated by the contracting parties at the time they enter into the contract. *Garrison*, 559 N.E.2d at 190. Instead, the injury must fall "within the scope of possible dangers ordinarily

accompanying the activity and, thus, [be] reasonably contemplated by the plaintiff." *Id.*

Recall that the Exculpatory Clause in the Home Depot rental agreement states the following:

> RELEASE, INDEMNIFICATION AND WAIVER OF DAMAGES. TO THE FULLEST EXTENT PERMITTED BY LAW, CUSTOMER INDEMNIFIES, RELEASES, WAIVES AND HOLDS THE HOME DEPOT HARMLESS FROM AND AGAINST ALL CLAIMS, LOSSES, EXPENSES (INCLUDING ATTORNEY'S FEES AND EXPENSES), LIABILITIES, AND DAMAGES (INCLUDING PERSONAL INJURY, DEATH, PROPERTY DAMAGE, LOST PROFITS, AND SPECIAL, INCIDENTAL AND CONSEQUENTIAL DAMAGES) IN ANY WAY CONNECTED WITH THE EQUIPMENT, ITS OPERATION OR USE, OR ANY DEFECT OR FAILURE THEREOF OR A BREACH OF THE HOME DEPOT'S OBLIGATIONS HEREIN.

R. 151-3, at ¶ 9. The rental agreement also includes an Assumption-of-Risk Clause, which provides, in relevant part:

> CUSTOMER LIABILITY. DURING THE RENTAL PERIOD, CUSTOMER ASSUMES ALL RISKS ASSOCIATED WITH AND FULL RESPONSIBILITY FOR THE POSSESSSION, CUSTODY AND OPERATION OF THE EQUIPMENT, INCLUDING, BUT NOT LIMITED TO, RENTAL CHARGES, CUSTOMER TRANSPORT, LOADING AND

UNLOADING, PROPERTY DAMAGES AND DESTRUCTION, LOSSES, PERSONAL INJURY, AND DEATH.

*Id.* at ¶ 7.

The scope of these provisions is broad. The Exculpatory Clause expressly includes within its list of assumed risks "personal injury" resulting from the "equipment, its operation or use." Horne's hand injury falls squarely within that language, and the injury he suffered falls within the scope of injuries reasonably contemplated by him. Remember, too, that Horne already knew from Home Depot's Safety and Operation Guide, which he had reviewed before, that he was to "use caution at all times" and that the "cables can twist or kink and cause serious injury," since "fingers or other body parts can be caught in rotating parts."

The majority rightly concludes that the Exculpatory Clause does not violate public policy, nor is the disparity in the parties' bargaining positions so great that the contract cannot be enforced as written. Absent any language in the rental agreement that Home Depot contractually assumed a duty of care, I would enforce the Exculpatory Clause as written against Horne's negligence claim. See, *e.g.*, *Jewelers Mut.*, 820 N.E.2d at 415 (assuming liability to exercise ordinary care to prevent unauthorized opening of box).

To be clear, Home Depot's promise to provide the machine in "good working condition" is not equivalent to the bank's promise in *Jewelers Mutual* to exercise ordinary care in preventing the unauthorized opening of a box. This is because it remains conceivable that Home Depot or any other lessor

could exercise reasonable care—including by adequately inspecting a rental device before turning it over to the consumer—while at the same time, providing a machine that was not in good working condition due to some latent defect that went undetected during the inspection. In such a scenario, the lessor would have breached a contractual duty without acting negligently. Breaching a contractual obligation and acting negligently are not one in the same. Finding nothing in the rental agreement suggesting that Home Depot promised to act with a specific standard of care, the Exculpatory Clause should apply. And its application bars Horne from recovering damages based in negligence.

## II

A final, practical observation warrants underscoring. Hardware and other big-box stores presumably rely on limited-liability and exculpatory provisions as one way to keep the price of the rentals affordable. Customers agree to this trade-off by signing the contract. Given today's majority decision, these stores might do well to revisit their rental agreements. Including contradictory promises—such as offering equipment "as is" and "in good working condition"—causes a real, yet avoidable, contractual conundrum. In the same vein, exculpating all liability in one clause, but only limiting that liability in another, creates another interpretive challenge—one in which I disagree with the majority's approach.

I respectfully dissent.